## Commonwealth *vs.* Porter P., a juvenile.

Suffolk. September 10, 2009. - March 11, 2010.

Present: Marshall, C.J., Ireland, Spina, Cowin, Cordy, Botsford, & Gants, JJ.

*Firearms. Search and Seizure,* Expectation of privacy, Consent. *Constitutional Law,* Search and seizure.

In an appeal from an order entered in the Juvenile Court suppressing a gun seized by the police during a search of a room in a transitional family shelter occupied by the juvenile, this court concluded that, despite the facts that the juvenile did not own the room, that he was limited in his use of the room, and that shelter staff members had a master key and could enter the room to ensure that he was abiding by the rules of the shelter, the juvenile nevertheless had a reasonable expectation of privacy in the room, which functioned as his home. [258-261] Cowin, J., dissenting, with whom Spina, J., joined.

In an appeal from an order entered in the Juvenile Court suppressing a gun seized by the police during a search of a room in a transitional family shelter occupied by the juvenile, this court concluded that the director of the shelter lacked actual authority to consent to the search of the room by police, where the director was not a coinhabitant with a shared right of access to the room, and where the written terms of the shelter manual that she provided to the police did not permit her to allow the police to enter the room to search for contraband or evidence [262-267]; further, where the director also lacked apparent authority to consent to the search, the police officers' belief that they had valid consent to search the room was based on a mistake of law, and therefore, the search of the room was unconstitutional [267-269] and required suppression of both the gun found by the police, who entered the room without a search warrant and without any claim of exigency, as well as an unprompted inculpatory statement made by the juvenile outside the room immediately after his arrest following the seizure of the gun [275].

This court concluded that a warrantless search of a home by a police officer does not violate art. 14 of the Massachusetts Declaration of Rights if the police officer has the voluntary consent of an individual with the apparent authority to give such consent, even where it turns out that the individual lacked common authority, but only if the reasonable mistake of fact occurs despite diligent inquiry by the police officer as to the consenting individual's common authority over the home. [269-274]

Complaint received and sworn to in the Suffolk County Division of the Juvenile Court Department on October 27, 2006.

A pretrial motion to suppress evidence was heard by *Leslie E. Harris,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *Spina*, J., in the Supreme Judicial Court for the county of Suffolk. After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*James D. Corbo* (*Rachel A. Scotch* with him) for the juvenile.

*Kathleen Celio*, Assistant District Attorney, for the Commonwealth.

The following submitted briefs for amici curiae:

*Beth L. Eisenberg*, Committee for Public Counsel Services, & *John Reinstein, Joshua Dohan, Barbara T. Kaban, & Gloria Y. Tan* for Committee for Public Counsel Services & others.

*Ruth A. Bourquin* for Massachusetts Coalition for the Homeless & another.

*David M. Siegel & Lawrence Friedman* for Suffolk Lawyers for Justice, Inc.

GANTS, J. The Commonwealth was granted leave to appeal from an order entered in the Juvenile Court suppressing a gun seized by the police during a search of a room in a transitional family shelter occupied by the juvenile and a statement that he made after his arrest. Having been notified by the shelter's director that the juvenile allegedly possessed a gun, the police officers determined that the director had the authority to consent to their entry and conducted a warrantless search of the juvenile's room with her consent. After the police found the gun, the juvenile made an unprompted inculpatory statement that suggested that the gun belonged to him. The juvenile was charged with delinquency by reason of the unlawful possession of a firearm and ammunition, in violation of G. L. c. 269, § 10 (*h*).[1] After an evidentiary hearing, the judge ordered suppression of the gun and the statement to the police. A single justice of this court granted the Commonwealth leave to pursue an interlocutory appeal from the judge's order in the Appeals Court. See Mass. R. Crim. P. 15 (a) (2), as appearing in 422 Mass. 1501 (1996). The Appeals Court reversed the allowance of the juve-

---

[1] The juvenile was initially charged with carrying a firearm without a license, in violation of G. L. c. 269, § 10 (*a*), but the Commonwealth amended the complaint.

nile's motion to suppress. *Commonwealth* v. *Porter P.*, 73 Mass. App. Ct. 85 (2008). We granted his application for further appellate review. We affirm the allowance of the motion to suppress.[2]

*Background.* In reviewing the allowance of a motion to suppress, we accept the judge's findings of fact absent clear error. *Commonwealth* v. *Alvarado*, 420 Mass. 542, 544 (1995), and cases cited. We summarize the facts as found by the judge, supplemented by uncontroverted facts in the record. See *Commonwealth* v. *Watson*, 430 Mass. 725, 726 n.5 (2000). We then determine "the correctness of the judge's application of constitutional principles to the facts as found." *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004), quoting *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996).

The juvenile and his mother moved into a room at the Roxbury Multi-Service Center, Inc., Family House Shelter (shelter) in March, 2006. The shelter provides temporary housing for otherwise homeless families and assists them in securing more permanent living situations. Through a contractual arrangement with the Commonwealth, the shelter is obligated to accept families referred by the Department of Transitional Assistance if there are vacant rooms of appropriate size to house them. Families may remain at the shelter until they find a permanent living situation, unless they commit a violation of the shelter's rules and regulations. The typical stay is between four and eight months. Apart from a key deposit fee of thirty dollars, the families do not pay to live at the shelter.

Each new resident of the shelter, including the juvenile and his mother, as part of the intake procedure, is given a manual setting forth the shelter's rules and regulations. According to the manual, residents are allowed to have visitors only during posted visiting hours, and may meet with them only in the visitors' lounge.[3] Residents are not permitted to enter another resident's room at

---

[2] We acknowledge the amicus briefs filed by the Committee for Public Counsel Services, American Civil Liberties Union of Massachusetts, Youth Advocacy Project, Children's Law Center, and Criminal Justice Institute, Harvard Law School; the Massachusetts Coalition for the Homeless and the Massachusetts Law Reform Institute; and Suffolk Lawyers for Justice, Inc.

[3] Residents may meet with "professional guests," which include social workers, school officials, and counsellors, during regular business hours, but only in the children's activity play area.

any time for any purpose. Because residents must commit to being actively engaged at least twenty hours per week in employment, education, or job training, or looking for employment or housing, the residents are required to be out of the shelter from 9 A.M. to 3 P.M. every weekday. The residents are also required to abide by a curfew, which varies by the day of the week. Each resident and his or her family is provided a furnished room and given a key to his or her room.[4] The director, however, has a master key that opens every door in the shelter, and the staff members have a master key that opens every resident's room. Members of the shelter's staff have the right to enter any room "for professional business purposes (maintenance, room inspections, etc.)," but only with the knowledge of the director. If a "business professional," such as a repair person or exterminator, requires entry to a resident's room, he or she must be escorted by a staff member, with the director's approval. The shelter staff may conduct "room checks" at any time without warning to monitor compliance with the shelter's "Good Housekeeping Standard" and other rules and regulations, including those affecting health and safety. The manual has a "zero tolerance policy in regards to violent acts committed by residents" and the possession of any weapon; "[a]ny resident in possession of a weapon will be terminated immediately." The shelter "reserves the right to contact the Police should the situation warrant," but the manual does not state that the shelter director or a staff member may consent to a police search of a resident's room.

On October 25, 2006, the shelter's director, Cynthia M. Brown, after having heard rumors that the juvenile had a gun, learned from a security officer that the juvenile had admitted to having a gun. Brown contacted the Boston police department and arranged a meeting for the following morning "to figure out how [to] proceed."

On October 26, 2006, at approximately 10:30 A.M., Detective Frank McLaughlin and four other police officers met with Brown at the shelter. The officers indicated their desire to "take care of [the situation] quietly" out of "concern for all these families who were . . . in a time of turmoil in their own lives." Brown told the officers that the resident's manual authorized her to

---

[4]The residents are not allowed to rearrange the furniture.

enter residents' rooms to conduct room checks and that she had inspected residents' rooms several days earlier after reports of suspected drug use. The officers reviewed the portions of the manual authorizing staff to make controlled room entries. Detective McLaughlin confirmed with Brown that her authority to search residents' rooms included the ability to search closets, drawers, bureaus, and other places not in plain view. The detective testified at the evidentiary hearing that he "[a]bsolutely" believed that Brown had the authority to consent to a police search of the juvenile's room. He based this belief on the shelter's rules and regulations in the resident's manual, as well as Brown's possession of a master key to the residents' rooms.

Brown and the officers agreed that they would conduct a search of the juvenile's room "under her policies." They planned to ask the juvenile to relinquish possession of the gun and then, if he cooperated, summons him to court at a later date. They then proceeded upstairs to the room, where Brown knocked on the door and announced that she was conducting a room check. When no one answered, she used her master key to open the door. The juvenile was in the room, and it appeared that he had been lying in bed moments before. Brown explained that she was there to conduct a room check and had the police with her because of allegations that the juvenile had a gun in his possession. Detective McLaughlin asked the juvenile to step out of the room into the hallway, and the juvenile complied. Two or three officers began to search the room while the detective and Brown attempted to speak with the juvenile, who denied having a gun. When Brown asked why he was not in school, he stated that he was home sick that day. During their search of the room, the officers found a Glock .40 caliber firearm containing hollow point bullets in the clip underneath a duffel bag in the closet.

The juvenile was then handcuffed and placed under arrest. Spontaneously, and not in response to any direct questioning by the police, the juvenile said, "The gun has no bodies on it; it's clean." After the juvenile made this statement, an officer read the juvenile the Miranda warnings, but the officers did not initiate questioning.

*Discussion.* The juvenile argues that the warrantless search of his room at the shelter and the seizure of his firearm violated the Fourth Amendment to the United States Constitution; art. 14

of the Massachusetts Declaration of Rights; and G. L. c. 276, § 1. He also argues that his statement to the police regarding the firearm should be suppressed as "fruit of the poisonous tree" of the illegal search and seizure under *Wong Sun* v. *United States*, 371 U.S. 471, 487-488 (1963).

1. To determine whether the search of the room violated the Fourth Amendment; art. 14; or G. L. c. 276, § 1, we must first determine whether a search in the constitutional sense took place. See *Commonwealth* v. *Frazier*, 410 Mass. 235, 244 n.3 (1991). "This determination turns on whether the police conduct has intruded on a constitutionally protected reasonable expectation of privacy." *Commonwealth* v. *Montanez*, 410 Mass. 290, 301 (1991), citing *California* v. *Ciraolo*, 476 U.S. 207, 211 (1986). "The measure of the defendant's expectation of privacy is (1) whether the defendant has manifested a subjective expectation of privacy in the object of the search, and (2) whether society is willing to recognize that expectation as reasonable." *Commonwealth* v. *Montanez, supra.* "The defendant bears the burden of establishing both elements." *Id.* "In examining the expectation of privacy question under art. 14, we do not necessarily reach the same result as under Fourth Amendment analysis." *Id.*

If no one has a reasonable expectation of privacy in the place searched, the police are free to search that place without a warrant and without probable cause, as often as they wish. See, e.g., *California* v. *Greenwood*, 486 U.S. 35, 39-41 (1988) (no reasonable expectation of privacy in garbage left outside curtilage of home); *Commonwealth* v. *Pratt*, 407 Mass. 647, 660-661 (1990) (same). If a defendant has a reasonable expectation of privacy, the police may search the place, in the absence of exigency, only with a warrant supported by probable cause or with consent. See *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 222 (1973); *Commonwealth* v. *Voisine*, 414 Mass. 772, 783 (1993).

Generally, in determining whether a defendant has a reasonable expectation of privacy in the place searched, we look to various factors, none of which needs be determinative, including the nature of the place searched, whether the defendant owned the place, whether he controlled access to it, whether it was freely accessible to others, and whether the defendant took "normal precautions to protect his privacy" in that place. *Commonwealth* v. *Pina*, 406 Mass. 540, 545, cert. denied, 498 U.S.

832 (1990), and cases cited. These factors may provide guidance when the place searched is not the defendant's home. See *Commonwealth* v. *Bryant*, 447 Mass. 494, 497 (2006) (search of files at law firm); *Commonwealth* v. *Welch*, 420 Mass. 646, 653-654 (1995) (search of lieutenants' room at fire station); *Commonwealth* v. *Montanez*, *supra* at 301-302 (search of hallway's dropped ceiling); *Commonwealth* v. *Pina*, *supra* at 544-546 (search of wallet left in halfway house where defendant no longer resided).

However, where, as here, the place searched *is* the interior of the juvenile's home, we need not consult any such factors in deciding that the juvenile has a reasonable expectation of privacy, because the Fourth Amendment and art. 14 expressly provide that every person has the right to be secure against unreasonable searches and seizures in his home. See Fourth Amendment to the United States Constitution ("The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated . . ."); art. 14 of the Massachusetts Declaration of Rights ("Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions"). "[I]n the case of the search of the interior of homes — the prototypical and hence most commonly litigated area of protected privacy — there is a ready criterion, with roots deep in the common law, of the minimal expectation of privacy that *exists*, and that is acknowledged to be *reasonable*" (emphasis in original). *Kyllo* v. *United States*, 533 U.S. 27, 34 (2001). See *United States* v. *United States Dist. Court for the E. Dist. of Mich.*, 407 U.S. 297, 313 (1972) ("physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed"). In view of the "sanctity of the home," "*all* details [in the home] are intimate details, because the entire area is held safe from prying government eyes" (emphasis in original). *Kyllo* v. *United States*, *supra* at 37.

The room that the juvenile and his mother shared at the shelter was a transitional living space, but it was nonetheless their home. The juvenile slept and kept his belongings in the room. He and his mother possessed a key to the room, allowing them the degree of privacy inherent in a locked door. The facts that he did not

own the room, that he was limited in his use of the room, and that shelter staff members had a master key and could enter the room "for professional business purposes" do not diminish the legitimacy of his privacy interest in the room. The same can be said of a patron of a hotel or a tenant in a boarding house, both of whom enjoy a reasonable expectation of privacy in their rooms. See *Stoner* v. *California*, 376 U.S. 483 (1964) (hotel patron); *McDonald* v. *United States*, 335 U.S. 451 (1948) (boarding house tenant). Indeed, in *Minnesota* v. *Olson*, 495 U.S. 91, 98-100 (1990), the United States Supreme Court made clear that a guest who stays but one night in a friend's home — with or without a key, and with or without paying rent — "has a legitimate expectation of privacy in his host's home." *Id.* at 98. "That the guest has a host who has ultimate control of the house is not inconsistent with the guest having a legitimate expectation of privacy" in the home. *Id.* at 99. In short, regardless of whether the juvenile resided in a palatial mansion or a single room in a transitional shelter, regardless of whether he owned the residence or was allowed to remain without paying rent, and regardless of whether his landlord or shelter director had a master key and could enter to ensure that he was abiding by the rules of the house, the juvenile had a reasonable expectation of privacy in his home.[5,6]

[5]Having concluded that the juvenile had a reasonable expectation of privacy in his room, we also conclude that the juvenile has standing under the Fourth Amendment to the United States Constitution to challenge the constitutionality of the search of the room. See *Rakas* v. *Illinois*, 439 U.S. 128, 139 (1978) (standing requirement "is more properly subsumed under substantive Fourth Amendment doctrine"). Because the juvenile is charged with unlawful possession of a firearm, G. L. c. 269, § 10 (*h*), he has automatic standing to contest the reasonableness of the search of his room under art. 14 of the Massachusetts Declaration of Rights. *Commonwealth* v. *Amendola*, 406 Mass. 592, 601 (1990) (adopting doctrine of "automatic standing" where defendant is charged with possessory offense and seeks to exclude evidence under Massachusetts Declaration of Rights).

[6]The dissent contends that, "in light of all the circumstances surrounding [the juvenile's] residency at the shelter," "there is no objectively reasonable expectation of privacy in the room." *Post* at 278. If this were so, a search of the room would not be a search in the constitutional sense, which would mean that the police lawfully could enter and search the room without any predication, as often as they wished, whenever they wished. The juvenile's room, according to the dissent, *post* at 276, 278, should be treated no differently from a common room in a fire station, shared by the officers on duty, see *Commonwealth* v. *Welch*, 420 Mass. 646, 653-654 (1995), or the dropped ceiling

2. Because the juvenile had a reasonable expectation of privacy in his room and because the police entered his room without a search warrant and without any claim of exigency, the burden shifts to the Commonwealth to prove that the entry was reasonable because it had the consent of a person with actual or apparent authority over the room. See *Illinois* v. *Rodriguez,* 497 U.S. 177, 181 (1990); *Commonwealth* v. *Burgess,* 434 Mass. 307, 310 (2001). Here, the juvenile did not consent to the entry, but Brown did, and her consent was "unfettered by coercion, express or implied, and also something more than mere 'acquiescence to a claim of lawful authority.' " *Commonwealth* v. *Voisine, supra* at 783, quoting *Commonwealth* v. *Walker,* 370 Mass. 548, 555, cert. denied, 429 U.S. 943 (1976). The question, then, is whether Brown, as shelter director, had actual or apparent authority to consent to the search of the room.

A third party has actual authority to consent to a warrantless search of a home by the police when the third party shares common authority over the home.[7] See *Georgia* v. *Randolph,* 547 U.S. 103, 106 (2006); *United States* v. *Matlock,* 415 U.S. 164, 171 (1974). See also *Commonwealth* v. *Ortiz,* 422 Mass. 64, 70 (1996); *Commonwealth* v. *Maloney,* 399 Mass. 785, 787-788 (1987). "The authority which justifies the third-party consent does not rest upon the law of property . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Georgia* v. *Randolph, supra* at 110, quoting *United States* v. *Matlock, supra* at 171 n.7.

The reasonableness of a consent search "is in significant part

of a common hallway in an apartment building, see *Commonwealth* v. *Montanez,* 410 Mass. 290, 300-303 (1991). While we agree with the dissent that the shelter residents in this case surrendered a substantial amount of personal privacy in return for temporary housing, we do not agree that the rooms they call their homes should be treated as if they were a common area under the Fourth Amendment or art. 14.

[7]The third party's consent is nullified if another physically present resident expressly refuses consent. *Georgia* v. *Randolph,* 547 U.S. 103, 120 (2006). Because the juvenile did not expressly refuse consent here, we do not address this exception.

a function of commonly held understanding about the authority that co-inhabitants may exercise in ways that affect each other's interests." *Georgia* v. *Randolph, supra* at 111. The Supreme Court has declared:

> "It is . . . easy to imagine different facts on which, if known, no common authority could sensibly be suspected. A person on the scene who identifies himself, say, as a landlord or a hotel manager calls up no customary understanding of authority to admit guests without the consent of the current occupant. . . . A tenant in the ordinary course does not take rented premises subject to any formal or informal agreement that the landlord may let visitors into the dwelling, . . . and a hotel guest customarily has no reason to expect the manager to allow anyone but his own employees into his room."

*Id.* at 112, citing *Chapman* v. *United States*, 365 U.S. 610, 617 (1961) (landlord could not give valid consent to police to enter space rented to tenant), and *Stoner* v. *California, supra* at 489 (hotel clerk was without authority to consent to search of guest's room).

Consequently, common authority does not mean simply the right to enter the premises that the police wish to search. Landlords often contractually retain that right, and hotels routinely do, but that does not allow the landlord or hotel manager to consent to a police search of a defendant's apartment or hotel room. See *Chapman* v. *United States, supra* at 616-617 (express covenant may give landlord right of entry to "view waste" but not to permit police to search for contraband); *United States* v. *Jeffers*, 342 U.S. 48, 51-52 (1951) (hotel patron gives "implied or express permission [to enter] to such persons as maids, janitors or repairmen in the performance of their duties" but not to police); *Commonwealth* v. *Weiss*, 370 Mass. 416, 419 (1976) (locker attendant at Logan Airport may have had authority to conduct private search of defendant's locker, but had no power to authorize police search). We have held that, when a college student executes a residence hall contract that permits college officials to enter the student's dormitory room "to inspect for hazards to health or personal safety," the college officials' authority to enter the room to conduct a health and safety inspection does not entitle those officials to consent to a police search

for evidence of a crime. *Commonwealth* v. *Neilson*, 423 Mass. 75, 76, 79-80 (1996). Here, the shelter's manual allowed shelter staff to enter the room for "professional business purposes," such as to make repairs, exterminate insects and rodents, and monitor compliance with the shelter's "Good Housekeeping Standard," and to escort "business professionals" into the room to accomplish these purposes, but it did not permit shelter staff to allow the police to enter to search for and seize contraband or evidence.

Therefore, the entitlement of a shelter staff member under the terms of a contract or resident manual to enter a resident's room to search for health or safety risks or violations of house rules, to remove any contraband found during that private search, including firearms and narcotics, and to invite the police to seize that contraband does not entitle that shelter staff member to grant consent to the police to enter the room with her to conduct the search. See *id.* Cf. *Commonwealth* v. *Leone*, 386 Mass. 329, 333 (1982) ("Evidence discovered and seized by private parties is admissible without regard to the methods used, unless State officials have instigated or participated in the search"). The shelter staff member may grant the police such consent only if the resident of the room has agreed in writing that the third party may allow the police to enter to search for contraband or evidence of a crime. See *Commonwealth* v. *Neilson, supra* at 79-80.

We understand that the police need clear guidance as to who has common authority over a residence and therefore who is entitled to give actual consent, because, as here, they rely on such consent in deciding to conduct a warrantless search, as opposed to securing the residence and applying for a search warrant.[8] Therefore, we declare under art. 14 that a person may have

---

[8]While the holding in this case rests heavily on the precedent in *Commonwealth* v. *Neilson*, 423 Mass. 75, 79-80 (1996), we recognize that we found no constitutional violation in *Boston Hous. Auth.* v. *Guirola*, 410 Mass. 820 (1991), which was cited but not distinguished in the *Neilson* opinion. See *Commonwealth* v. *Neilson, supra* at 79. In *Boston Hous. Auth.* v. *Guirola, supra* at 822, the exterminator who was sent to a Boston Housing Authority (BHA) apartment by the property manager observed a sawed-off shotgun visible from the broom closet, ammunition in the kitchen, and white powder in one of the bedrooms, and informed the site manager, who telephoned a BHA police officer. The police officer entered the apartment, removed the sawed-off shotgun, and then obtained a search warrant. *Id.* We held that the housing police officer's entry into the apartment and seizure of the sawed-off shotgun

actual authority to consent to a warrantless search of a home by the police only if (1) the person is a coinhabitant with a shared right of access to the home, that is, the person lives in the home, either as a member of the family, a roommate, or a houseguest whose stay is of substantial duration and who is given full access to the home; or (2) the person, generally a landlord, shows the police a written contract entitling that person to allow the police to enter the home to search for and seize contraband or evidence.[9] No such entitlement may reasonably be presumed by custom or oral agreement.[10,11]

was constitutional because the lease allowed management entry without notice for emergency purposes, and the discovery of the sawed-off shotgun, ammunition, and white powder "presented a sufficient emergency to permit, under the lease, the BHA police officer's initial entry to the apartment for safety purposes." *Id.* at 828. The court also upheld the police officer's entry into the apartment to seize the sawed-off shotgun under the emergency exception to the warrant requirement, because of the "danger to the community and to the police posed by the sawed-off shotgun." *Id.* at 829. See *Commonwealth* v. *Snell*, 428 Mass. 766, 774-775, cert. denied, 527 U.S. 1010 (1999), quoting *Commonwealth* v. *Bates*, 28 Mass. App. Ct. 217, 219-220 (1990) (emergency exception "applies when the purpose of the police entry is not to gather evidence of criminal activity but rather, because of an emergency, to respond to an immediate need for assistance for the protection of life or property"). Because the police waited one day after their initial conversation with Brown to enter the room, the Commonwealth does not contend here that the warrantless police entry into the juvenile's room could be justified without consent as an appropriate response to an emergency.

[9]We declare this standard only under art. 14, rather than under the Fourth Amendment, even though it is consistent with Federal constitutional case law. If it differs at all from Federal constitutional case law, it narrows the scope of actual authority, and therefore does not run afoul of the Fourth Amendment.

[10]This standard applies only when consent is sought to conduct a search of the private area of an occupied residence; we do not address here whether the same standard should apply where consent is sought to search the common area or basement of an apartment house or an unoccupied room or apartment. See *Commonwealth* v. *Connolly*, 356 Mass. 617, 624, cert. denied, 400 U.S. 843 (1970) ("Since the basement was a common area freely available to all the tenants, one tenant could give permission to its search"). Nor do we address whether this standard should apply to commercial property, where an individual's privacy expectation may be less substantial. See *Commonwealth* v. *Blinn*, 399 Mass. 126, 128, appeal dismissed, 482 U.S. 921 (1987), quoting *Dow Chem. Co.* v. *United States*, 476 U.S. 227, 237-238 (1986) ("the government 'has "greater latitude to conduct warrantless inspections of commercial property" because "the expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the sanctity accorded an individual's home" ' ").

[11]Even if a coinhabitant of the home had actual authority to consent to a

Coinhabitancy need not be defined by any legal relationship, such as that of spouses or cotenants on a lease. See *Georgia* v. *Randolph*, 547 U.S. 103, 110-111 (2006); *United States* v. *Matlock*, 415 U.S. 164, 175-177 (1974) (unmarried person living together in same bedroom with juvenile may consent to search of bedroom). See also *Commonwealth* v. *Martin*, 358 Mass. 282, 288 (1970). Rather, it should be defined by the person's demonstrated intent to make a residence his or her home for some substantial period of time. See generally *Georgia* v. *Randolph*, *supra* at 110-112; *United States* v. *Matlock*, *supra* at 171 & n.7. Therefore, an overnight houseguest would lack the authority to consent, unless his or her stay is substantial in its duration, and he or she is given "the run of the house." *United States* v. *Turbyfill*, 525 F.2d 57, 58-59 (8th Cir. 1975) (houseguest who had been staying for several weeks and was "occupant of indefinite duration" who "had the run of the house" could consent to police search). See *United States* v. *Clutter*, 914 F.2d 775, 777 (6th Cir. 1990), cert. denied, 499 U.S. 947 (1991) ("As a general consideration, there is every reason to suppose that mature family members possess the authority to admit police to look about the family residence, since in common experience family members have the run of the house"); 4 W.R. LaFave, Search and Seizure § 8.5(e), at 235 & n.117 (4th ed. 2004).

Under this standard, Brown did not have actual authority to consent to the police entry into the room to search for a firearm. She was not a coinhabitant of the room, and the shelter manual did not permit her to allow the police to enter the room to search for contraband or evidence. Rather, the manual reserved the right of shelter staff to enter any residential room "for professional business purposes (maintenance, room inspections, etc.)," and to accompany "business professionals" allowed to enter for those purposes. Law enforcement investigation is not reasonably understood to be a "professional business purpose[]." The manual also prohibited weapons of any kind and reserved shelter staff's "right to contact the Police should the situation warrant," but this reservation does not reserve the right to allow the police

search of the home, the consent would not extend to a closed suitcase, overnight bag, or gym bag located inside the home that did not belong to the coinhabitant. See *United States* v. *Davis*, 332 F.3d 1163 (9th Cir. 2003); *United States* v. *Salinas-Cano*, 959 F.2d 861 (10th Cir. 1992).

to enter a resident's room to search for a firearm if accompanied by staff.[12]

3. Having concluded that Brown did not have actual authority to consent to the search of the room by the police, we turn to whether she had the apparent authority to consent.

In *Illinois* v. *Rodriguez*, 497 U.S. 177, 179, 186 (1990) (*Rodriguez*), the United States Supreme Court held that the Fourth Amendment's proscription of "unreasonable searches and seizures" is not violated when a warrantless entry of a home is based on the consent of a third party who the police, at the time of entry, reasonably, but mistakenly, believed had common authority over the premises. The Court reasoned, "[T]o satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government — whether the magistrate issuing a warrant, the police officer executing a warrant, or the police officer conducting a search or seizure under one of the exceptions to the warrant requirement — is not that they always be correct, but that they always be reasonable." *Id.* at 185-186. The Court concluded that "[t]he Constitution is no more violated when officers enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry is a resident of the premises, than it is violated when they enter without a warrant because they reasonably (though erroneously) believe they are in pursuit of a violent felon who is about to escape." *Id.* at 186. Apparent authority is "judged against an objective standard: would the facts available to the officer at the moment . . . 'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises?" *Id.* at 188, quoting *Terry* v. *Ohio*, 392 U.S. 1, 21-22 (1968).

Federal courts have universally limited apparent authority to reasonable mistakes of fact, not mistakes of law. See, e.g., *United States* v. *Ruiz*, 428 F.3d 877, 882 (9th Cir. 2005); *United States* v. *Davis*, 332 F.3d 1163, 1170 (9th Cir. 2003); *United States* v. *Gutierrez-Hermosillo*, 142 F.3d 1225, 1230 (10th Cir.),

---

[12]Our conclusion that Brown did not have actual authority to consent to the search of the juvenile's room by the police rests on both the Fourth Amendment and art. 14. See note 9, *supra.*

cert. denied, 525 U.S. 900 (1998); *United States* v. *Brazel*, 102 F.3d 1120, 1148 (11th Cir.), cert. denied, 522 U.S. 822 (1997); *United States* v. *Brown*, 961 F.2d 1039, 1041 (2d Cir. 1992); *United States* v. *Salinas-Cano*, 959 F.2d 861, 865 (10th Cir. 1992); *United States* v. *Whitfield*, 939 F.2d 1071, 1073-1074 (D.C. Cir. 1991). The *Rodriguez* decision "thus applies to situations in which an officer would have had valid consent to search if the facts were as he reasonably believed them to be." *United States* v. *Whitfield, supra* at 1074. "An officer's mistaken belief as to the law, even if reasonable, cannot establish apparent authority." *United States* v. *Davis, supra* at 1170. See *United States* v. *Elliott*, 50 F.3d 180, 186 (2d Cir. 1995), cert. denied, 516 U.S. 1050 (1996) (*Rodriguez* "validates only searches that are based on a reasonable mistake as to the facts, not those based on an erroneous legal conclusion drawn from the known facts"). See generally 4 W.R. LaFave, Search and Seizure, *supra* at § 8.3(g), at 175 & n.126.

The police officers' mistake in this case was one of law, not of fact. Detective McLaughlin and the other officers took considerable care to ascertain whether Brown had the authority to consent to a search of the room. Prior to entering the room, Detective McLaughlin conferred with Brown and reviewed the portions of the manual pertaining to staff searches of the rooms. They accurately understood the relevant facts regarding Brown's authority to consent to the search. They erred not in their understanding of the facts or in the diligence of their inquiry into Brown's authority to consent to the search, but in their understanding of the law; they believed that these facts gave them valid consent to search the room when, as a matter of law, they did not.[13] Because

[13]Their understanding of the law, while mistaken, was not unreasonable. See note 8, *supra.* A police officer's error of law, however, no matter how reasonable, cannot establish apparent authority. *United States* v. *Davis*, 332 F.3d 1163, 1170 (9th Cir. 2003). See *Stoner* v. *California*, 376 U.S. 483, 488 (1964) (rejecting government's argument that police had reasonable basis to believe that hotel clerk had authority to consent to search of hotel room, declaring that "the rights protected by the Fourth Amendment are not to be eroded by strained applications of the law of agency or by unrealistic doctrines of 'apparent authority' "); *Petersen* v. *People*, 939 P.2d 824, 831 (Colo. 1997) (if officer's misunderstanding of law were sufficient to establish apparent authority to consent to search, "protections of the Fourth Amendment would be effectively limited to what the average police officer believed was reasonable").

Brown did not have actual or apparent authority to consent to the search, the warrantless search of the room was not reasonable under the Fourth Amendment or art. 14.

4. Having concluded that the officers' search of the room was unconstitutional under the Fourth Amendment and art. 14, we need not decide under art. 14 whether a warrantless search of a home may be justified by apparent authority. We choose to decide this issue because (1) the issue, at our request, has been fully briefed, (2) our earlier decisions have suggested, but not decided, that art. 14 adopts the doctrine of apparent authority, see *infra*, and (3) our trial courts are already obliged to apply this doctrine, because the Appeals Court has recently approved of a consent search based solely on apparent authority. See *Commonwealth* v. *Dejarnette*, 75 Mass. App. Ct. 88, 95-96 (2009).

Even before the United States Supreme Court decided *Rodriguez, supra*, we suggested that apparent authority may justify a warrantless search where the person giving consent lacks actual authority, but we have never approved a warrantless search exclusively on apparent authority. See *Commonwealth* v. *Maloney*, 399 Mass. 785, 787-788 (1987) (holding that live-in boy friend of defendant's sister could consent to police search because he "appeared to be a lawful occupant with authority to permit the police to enter," while simultaneously recognizing actual authority of sister, who was also present, to consent); *Commonwealth* v. *Wahlstrom*, 375 Mass. 115, 118 (1978) (holding that employee of store had "sufficient appearance of authority" to consent to police search but deciding case on basis of common, or actual, authority). See also *Commonwealth* v. *Rogers*, 444 Mass. 234, 248-249 (2005) (Greaney, J., dissenting) (officer's entry justified by apparent authority, in addition to actual authority); *Commonwealth* v. *Lopez*, 74 Mass. App. Ct. 815, 831 n.4 (Lenk, J., dissenting), further appellate review granted, 455 Mass. 1103 (2009) ("To date, no warrantless police entry has been upheld in Massachusetts solely on the basis of apparent authority to consent . . ."). Consistent with these past decisions but for the first time today, we explicitly adopt under art. 14 the doctrine of apparent authority.

"The right of police officers to enter into a home, for whatever purpose, represents a serious governmental intrusion into one's privacy." *Commonwealth* v. *Peters*, 453 Mass. 818, 819 (2009),

quoting *Commonwealth* v. *DeJesus*, 439 Mass. 616, 619 (2003). In general, art. 14 allows the police to enter a home in four circumstances: (1) a judicial warrant supported by probable cause, *Commonwealth* v. *Anderson*, 406 Mass. 343, 346 (1989); (2) probable cause plus exigency, such as hot pursuit of a violent suspect trying to escape, *Commonwealth* v. *Paniaqua*, 413 Mass. 796, 798 (1992); (3) under the "emergency aid" doctrine, where the police have "an objectively reasonable basis to believe that there may be someone inside who is injured or in imminent danger of physical harm," *Commonwealth* v. *Peters*, *supra* at 819; and (4) the voluntary consent of a person with common authority over the home, *supra* at 264-265.

In each of the first three circumstances, art. 14 is not violated by reasonable mistakes of fact. We evaluate the reasonableness of a police officer's conduct based on the information available to him at the time, not on what we later learn to be true. *Commonwealth* v. *Young*, 382 Mass. 448, 456 (1981) ("whether the response of the police was reasonable and therefore lawful [is] to be evaluated in relation to the scene as it could appear to the officers at the time, not as it may seem to a scholar after the event with the benefit of leisured retrospective analysis"). If probable cause in a search warrant affidavit is based on information from a reliable source with personal knowledge, we do not conclude that there has been a violation of art. 14 if the information turns out to be inaccurate, provided the affiant did not know the information to be false or show reckless disregard for its truthfulness. *Commonwealth* v. *Wilkerson*, 436 Mass. 137, 140-142 (2002), quoting *Commonwealth* v. *Storey*, 378 Mass. 312, 321 (1979), cert. denied, 446 U.S. 955 (1980) ("existence of probable cause is determined 'at the moment of arrest,' not in light of subsequent events"). If a police officer has probable cause to believe that a suspect has just committed a violent crime and reason to believe that he fled into an apartment, and if there is not time to obtain a warrant because of exigent circumstances, we do not conclude that there has been a violation of art. 14 if, when the police enter the apartment, the suspect is no longer there. *Commonwealth* v. *DiSanto*, 8 Mass. App. Ct. 694, 701 & n.7, 702-703 (1979), cert. denied, 449 U.S. 855 (1980). If the police enter a home based on an objectively reasonable basis to believe that someone inside is injured or is in imminent

danger of physical harm, we do not conclude that there has been a violation of art. 14 if it turns out that no one is home. See *Commonwealth* v. *Peters, supra* at 824. By this same reasoning, we do not believe that art. 14 is violated if a warrantless search of a home occurs after a police officer obtains the voluntary consent of a person he reasonably believes, after diligent inquiry, has common authority over the home, but it turns out that the person lacked common authority. See *Illinois* v. *Rodriguez,* 497 U.S. 177, 186 (1990). Apparent authority in the context of consent to search is a police officer's finding of actual authority based on a reasonable mistake of fact.[14],[15]

While we conclude that a search of a home does not violate art. 14 if the police officer has the voluntary consent of an individual with the apparent authority to give such consent, we do so only if the reasonable mistake of fact occurs despite diligent inquiry by the police as to the consenting individual's common authority over the home.[16] To conduct a diligent inquiry, a police officer must take two basic steps. First, the police officer must base his conclusion of actual authority on facts, not assumptions or impressions. He must continue his inquiry until he has reliable information on which· to base a finding of actual authority to consent. "[I]n the absence of sufficient facts, officers have a duty to seek further information in order to determine whether they may reasonably infer that the inviter has the neces-

---

[14]Because the mistake of fact must be reasonable, we do not uphold consent searches where the police either know their information supporting a finding of apparent authority to be false or act in reckless disregard of its falsity. See *United States* v. *James,* 353 F.3d 606, 615 (8th Cir. 2003) ("It cannot be reasonable to rely on a certain theory of apparent authority, when the police themselves know what the consenting party's actual authority is . . .").

[15]The doctrine of apparent authority applies only to a reasonable mistake of fact as to actual authority to consent; we do not decide whether (and do not suggest that) it would justify a warrantless search where a police officer mistakenly believes that the consent was free and voluntary. See generally 4 W.R. LaFave, Search and Seizure § 8.1(b), at 15-19 (4th ed. 2004), and cases cited.

[16]We do not consider the circumstances in which a police officer reasonably may rely on the authority of an occupant of a home to gain *entry* into a home, where the officer has no intention of conducting a search. See *Commonwealth* v. *Lopez,* 74 Mass. App. Ct. 815, 822, further appellate review granted, 455 Mass. 1103 (2009) (because officer's purpose limited only to entry, he "acted reasonably in entering without making further inquiry" into authority of woman who opened motel room door and gave consent).

sary authority to consent to an entry or search of the premises."
*United States* v. *Rosario*, 962 F.2d 733, 738 (7th Cir. 1992). See
*United States* v. *Cos*, 498 F.3d 1115, 1129-1130 (10th Cir. 2007)
("government must offer some additional evidence [beyond mere
presence of third party on the premises] to support a claim of ap-
parent authority"); *United States* v. *Goins*, 437 F.3d 644, 649
(7th Cir.), cert. denied, 549 U.S. 832 (2006) (police obligated to
take "sufficient precautions to assure themselves of the truth" of
assertion of actual authority by person consenting to search);
*United States* v. *Waller*, 426 F.3d 838, 846 (6th Cir. 2005), quot-
ing United States *vs.* McCoy, U.S. Ct. App., Nos. 97-6485, 97-
6486, & 97-6488 (6th Cir. May 12, 1999) ("government cannot
establish that its agents reasonably relied upon a third party's ap-
parent authority 'if agents, faced with an ambiguous situation,
nevertheless proceed without making further inquiry. If the agents
do not learn enough, if the circumstances make it unclear whether
the property about to be searched is subject to "mutual use" by
the person giving consent, "then warrantless entry is unlawful
without further inquiry" ' ").

Second, even when the consenting individual explicitly asserts
that he lives there, if "the surrounding circumstances could con-
ceivably be such that a reasonable person would doubt its truth,"
the police officer must make further inquiry to resolve the
ambiguity. *Rodriguez, supra* at 188. The police officer owes a
duty to explore, rather than ignore, contrary facts tending to sug-
gest that the person consenting to the search lacks actual authority.
Police must not only thoroughly question the individual consent-
ing to the search with respect to his or her actual authority, but
also pay close attention to whether the surrounding circumstances
indicate that the consenting individual is truthful and accurate in
asserting common authority over the premises.[17,18] See *United
States* v. *Cos, supra* at 1130 (ambiguous circumstances require

---

[17]We do not suggest that the police officer must verify a consenting
individual's tenancy with the landlord or ownership with the title registry
before reasonably accepting a consenting individual's claim of common
authority. See *Georgia* v. *Randolph*, 547 U.S. 103, 112 (2006) ("no burden on
the police to eliminate the possibility of atypical [tenancy] arrangements, in
the absence of reason to doubt that the regular scheme was in place"); *United
States* v. *Elliott*, 50 F.3d 180, 187 (2d Cir. 1995), cert. denied, 516 U.S. 1050
(1996) (police were reasonable in relying on building owner's consent to
search of common areas and unleased rooms without verifying that building's

officers to make additional inquiry); *United States* v. *Goins, supra* at 646, 649 (defendant's girl friend taking cooking pans and bag of female clothing from apartment "provided adequate support for [her] representations" that she lived there "on-and-off" and could consent to search).

The juvenile argues that apparent authority is akin to the "good faith" exception to the exclusionary rule adopted by the United States Supreme Court in *United States* v. *Leon*, 468 U.S. 897 (1984), and that we should refuse to adopt apparent authority under art. 14 for the same reasons we refused to adopt the good faith exception. It is true that we "never adopted the 'good faith' exception, and we do not adopt it now." *Commonwealth* v. *Valerio*, 449 Mass. 562, 569 (2007). The "good faith" exception, however, is an exception to the exclusionary rule, and therefore applies only where there is a violation of the Fourth Amendment. See *Herring* v. *United States*, 129 S. Ct. 695, 699 (2009) (accepting "parties' assumption that there was a Fourth Amendment violation"); *United States* v. *Leon, supra* at 925-926 (invalidity of search warrant not challenged). When the police conduct a warrantless search of a home based on consent and make a reasonable mistake of fact as to the consenting party's actual authority to consent, the search is not in violation of the Fourth Amendment or art. 14, and therefore the question whether the exclusionary rule should apply to the evidence seized during the search is never reached. It is perhaps for this reason that, although *Rodriguez, supra*, was decided six years after *United States* v. *Leon*,

---

operation as rooming house was licensed by city). The diligence of the inquiry will be measured by what reasonably can be accomplished at the time and place of the consent. See, e.g., *United States* v. *Carrasco*, 540 F.3d 43, 49 (1st Cir. 2008) (officers acted reasonably where no information available "at the time of the search" indicated that person giving consent lacked actual authority).

[18]It is unclear whether the diligent inquiry we require under art. 14 is required under the Fourth Amendment. The United States Supreme Court in *Illinois* v. *Rodriguez*, 497 U.S. 177, 188 (1990), made clear that, even when the consenting individual explicitly asserts that he lives at the residence, the police have a duty of further inquiry when "a reasonable person would doubt its truth." Circuit courts of the United States Court of Appeals, however, are divided as to whether police may base their finding of actual authority on appearances alone. See *United States* v. *Almeida-Perez*, 549 F.3d 1162, 1171 (8th Cir. 2008) (Tenth Circuit and District of Columbia Circuit "require police to go behind appearances to verify third party authority," but Eighth Circuit "has been more liberal about allowing police to form their impressions from context").

*supra*, the *Leon* decision was not cited in the *Rodriguez* decision. Because apparent authority is not based on the "good faith" exception to the exclusionary rule, there is no logical conflict in our adopting apparent authority but not the "good faith" exception.[19]

[19]Many States have either adopted the doctrine of apparent authority under their own Constitutions or presumed its compatibility with their Constitutions. See *People* v. *Hopkins*, 870 P.2d 478, 481 (Colo. 1994); *State* v. *McCaughey*, 127 Idaho 669, 673-674 (1995); *Lee* v. *State*, 849 N.E.2d 602, 610 (Ind. 2006), cert. denied, 549 U.S. 1211 (2007); *State* v. *Licari*, 659 N.W.2d 243, 253 (Minn. 2003), cert. denied, 544 U.S. 1054 (2005); *State* v. *Sawyer*, 147 N.H. 191, 195-196 (2001), cert. denied, 537 U.S. 822 (2002); *State* v. *Maristany*, 133 N.J. 299, 307 (1993); *Commonwealth* v. *Strader*, 593 Pa. 421, 428 (2007), cert. denied, 128 S. Ct. 1452 (2008). See also *Commonwealth* v. *Basking*, 970 A.2d 1181, 1192-1193 (Pa. Super. Ct. 2009) (apparent authority does not frustrate the "enhanced notion of privacy" embodied in art. I, § 8, of Pennsylvania Constitution).

The Supreme Courts of three States — Hawaii, Montana, and Washington — have refused to recognize the apparent authority doctrine under their State Constitutions. See *State* v. *Lopez*, 78 Haw. 433, 447 (1995); *State* v. *McLees*, 298 Mont. 15, 26-27 (2000); *State* v. *Morse*, 156 Wash. 2d 1, 12 (2005). Each of these courts rested its conclusion on provisions in its State Constitution that provided a right to privacy, rather than provisions prohibiting unreasonable searches. See *State* v. *Lopez, supra* at 446, citing art. I, § 7, of Hawai'i Constitution ("right of the people to be secure in their persons, houses, papers and effects against . . . invasions of privacy shall not be violated"); *State* v. *McLees, supra* at 23, citing art. II, § 10, of Montana Constitution ("right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest"); *State* v. *Morse, supra* at 9, citing art. I, § 7, of Washington Constitution ("No person shall be disturbed in his private affairs, or his home invaded, without authority of law"). Article 14 does not expressly provide a right to privacy beyond the right to "be secure from all unreasonable searches, and seizures." *Opinion of the Justices*, 375 Mass. 795, 808 (1978). Massachusetts has a right of privacy, albeit one created by statute. G. L. c. 214, § 1B ("person shall have a right against unreasonable, substantial or serious interference with his privacy"). However, in determining the lawfulness of a search under this statutory provision, we have said that the analysis mirrors that under art. 14, because both hinge on the reasonableness of the police conduct. *O'Connor* v. *Police Comm'r of Boston*, 408 Mass. 324, 329-330 (1990) ("We think that it is highly unlikely that the Legislature intended to provide a right of action to a person whose privacy was substantially or seriously interfered with, but reasonably so"). We are not persuaded by the decisions in these three States that our law of search and seizure will be improved by viewing these searches through the prism of a right to privacy.

The Supreme Court of Oregon, the Court of Appeals of New Mexico, and a Superior Court in Delaware have also refused to recognize the apparent authority doctrine under their State Constitutions. See State *vs.* Devonshire, Del. Super. Ct., No. 0307010804 (Jan. 20, 2004) (unpublished opinion); *State*

5. Having concluded that the warrantless search was justified by neither Brown's actual authority to consent to the search nor her apparent authority to do so, the firearm seized by the police during the search must be suppressed as "fruit of the poisonous tree." See *Wong Sun* v. *United States*, 371 U.S. 471, 487-488 (1963). The juvenile's statement to the police must also be suppressed. While the judge found that the statement was "made spontaneously and not in response to any direct questioning by the police," the statement was made outside the room immediately after the juvenile was arrested and handcuffed following the seizure of the firearm in the room. As a result, the statement was the "fruit" of the unlawful search, and was not so distant in time or location from the unlawful search as to dissipate the taint arising from the search. *Commonwealth* v. *Fredette*, 396 Mass. 455, 460 (1985) (temporal proximity of arrest to the obtaining of evidence one factor "[i]n determining whether the connection between the evidence and the improper conduct has become so attenuated as to dissipate the taint"). See *Commonwealth* v. *Conway*, 2 Mass. App. Ct. 547, 554 (1974) ("Since there was manifest a causal relationship between the finding of the [incriminating evidence] and the statements of the defendant, the statements should have been suppressed").

*Conclusion.* The judge's decision allowing the motion to suppress is affirmed. The case is remanded to the Juvenile Court for further proceedings consistent with this opinion.

*So ordered.*

COWIN, J. (dissenting, with whom Spina, J., joins). I respect-

v. *Wright*, 119 N.M. 559, 564-565 (1995); *State* v. *Carsey*, 295 Or. 32, 44-45 (1983). The Court of Appeals of New Mexico and the Superior Court in Delaware rest their refusal on their State Supreme Court's rejection under their State Constitutions of the "good faith" exception to the exclusionary rule in *United States* v. *Leon*, 468 U.S. 897 (1984). See State *vs.* Devonshire, *supra*; *State* v. *Wright*, *supra* at 564. The Oregon Supreme Court, prior to the United States Supreme Court's decision in *Illinois* v. *Rodriguez*, 497 U.S. 177 (1990), held that the consent of a person without actual authority to consent "is, in effect, no consent at all" and that the "good faith" of the officers is "irrelevant" because a warrantless search without consent is unreasonable under the Fourth Amendment. *State* v. *Carsey*, *supra* at 44, 46. We have earlier discussed why we consider both of these analyses to be flawed. See *supra*.

fully dissent based on my conclusion that the juvenile has no "constitutionally protected reasonable expectation of privacy." *Commonwealth* v. *Montanez*, 410 Mass. 290, 301 (1991). I agree with the well-reasoned analysis of the Appeals Court in this regard. See *Commonwealth* v. *Porter P.*, 73 Mass. App. Ct. 85, 91-94 (2008). It follows that the director of the Roxbury Multi-Service Center, Inc., Family House Shelter (shelter) acted well within her rights in admitting police to the juvenile's room, and suppression of the firearm and the juvenile's statements was not justified.

The problem with the court's view is that it ignores the situation "on the ground" or — put differently — fails to acknowledge what the shelter is and the circumstances of its operation. The shelter services a transient population. It makes available a temporary space to live off the streets. In return, and for obvious reasons, the shelter requires that its residents surrender a considerable degree of personal freedom. Contrary to the fiction in which the court indulges, this is neither a hotel nor a dormitory. An examination of the characteristics of life at the shelter, in my view, puts to rest any premise that a resident could conceivably harbor a reasonable expectation that his or her privacy would limit the action of the shelter authorities in this case.

Before obtaining a room at the shelter, all residents receive a copy of the shelter's "Resident's Manual" (manual). This manual sets forth the rules that residents are expected to follow while living in the facility. A major purpose of these rules is the maintenance of order and safety in the shelter. Like members of all families that move into the building, the juvenile and his mother received and reviewed the manual at the beginning of their stay at the shelter. The motion judge found that "[t]he family was required to review and sign-off on the manual before taking residence at the shelter." An intake worker explained the rules to them and noted the delivery of the manual on an intake form. By moving into the shelter, the residents (including the mother and the juvenile here) signify their assent to the rules. By agreeing to these rules, residents forgo a substantial amount of personal privacy in exchange for temporary housing and the other services the shelter provides.[1]

---

[1] I do not suggest that the shelter could form a contract with a minor abrogating

Shelter rules dictate when residents can be present in the building. Residents must be out of the building from 9 A.M. until 3 P.M. on weekdays,[2] and they must be in the shelter by a specified curfew time each evening. Each time residents enter or leave the facility, they must sign in or out at the front desk. Residents are also required to observe "Family Time Quiet Hour" from 8:30 to 9:30 P.M. each evening. During this time, "there is minimal noise," and parents are expected to "go[] over homework, read[] a book, or play[] family games" with their children.

Additionally, the shelter regulates residents' use of their rooms. Residents "are not allowed access or permitted to enter another resident's room at any time," and they may meet with outside visitors only during stated times at designated locations in the building. The shelter's rules even forbid residents from rearranging the furniture in their rooms, limit the number of suitcases present in the room to "two . . . per family member," and prohibit residents from placing items "on the windowsills." Alcohol and firearms are strictly forbidden in the facility, as are sexual activities (except between residents "coupled" together).

In addition to regulating the use of residents' rooms, the shelter restricts many aspects of their personal conduct. Residents must spend "a minimum of twenty hours per week actively engaged in employment, job search, skills/educational training and housing search." They must save thirty per cent of their monthly income and provide shelter staff with their banking records as proof of same. Furthermore, residents must attend weekly meetings with social service providers. In order to maintain the premises, the shelter requires residents to perform weekly chores and clean their rooms according to enumerated housekeeping standards.

The manual reveals a special concern for eliminating the presence of weapons in the shelter. The shelter forbids possession of "weapons of any kind." The manual defines a weapon as "any

the minor's right to privacy. See *Sharon* v. *Newton*, 437 Mass. 99, 107 (2002) (contract by minor voidable before minor reaches age of majority or within reasonable time thereafter). Instead, I rely on the fact that the juvenile's mother can consent on his behalf. See *Commonwealth* v. *Ortiz*, 422 Mass. 64, 70 (1996) (parent may consent to search of child's room).

[2]The stated purpose of this requirement is to encourage residents to spend this time working, attending job training, or searching for employment or housing.

item that can be used to threaten or cause physical damage or harm."

Shelter staff may enforce these rules by "perform[ing] random room checks and routine room inspections . . . at any time." Such searches are authorized for investigating violations of any rule, from the rules prohibiting possession of drugs and weapons to the housekeeping rules requiring that "[c]lothing is put away neatly," "[b]eds are made daily," and "[d]iaper pails are . . . emptied every morning." The rules are enforced through an internal discipline system consisting of warnings for initial violations and termination of the residency for repeated violations. Residents who commit a violation that threatens the safety of other residents or staff, including the possession of a weapon, face immediate termination.

The reasonableness of the juvenile's expectation of privacy must be evaluated in light of all the circumstances surrounding his residency at the shelter. Where the shelter director can enter any resident's room essentially at will, there is no objectively reasonable expectation of privacy in the room. See *Commonwealth* v. *Welch*, 420 Mass. 646, 653-654 (1995) (whether area searched is freely accessible to others is relevant to reasonableness of expectation of privacy); *Commonwealth* v. *Pina*, 406 Mass. 540, 545, cert. denied, 498 U.S. 832 (1990) (defendant's control over area searched is relevant to reasonableness of expectation of privacy). Looked at from a different perspective, the shelter director possessed sufficient common authority over the premises to consent to a police search. See *Commonwealth* v. *Considine*, 448 Mass. 295, 301 (2007) (by prohibiting students on field trip from occupying hotel rooms during day, chaperones retained sufficient control to authorize search). The staff's plenary authority in the circumstances, including the right to conduct unannounced inspections, meaningfully differentiates the shelter from hotels, apartments, and university dormitories.

The court does not dispute that the conditions of the manual grant shelter staff the authority to enter residents' rooms to search for contraband, but it holds that this power does not extend to granting consent to the police to do the same. See *ante* at 264. This is an entirely unwarranted and impractical distinction, requiring that the shelter staff resort to self-help in

order to obtain prompt enforcement of the prohibition on fire-arms. Shelter staff are not trained in dealing with guns or people armed with guns, and they cannot arrest those in possession of weapons. A commonsense reading of the provisions of the manual regarding weapons plainly communicates that shelter staff, at its choosing, may seek police assistance in undertaking their reserved right to control the premises. In sum, there was no objective basis in these circumstances for any expectation that the juvenile may have had that his room would be immune from the kind of entry that occurred.