SUPERIOR COURT 
 
 COMMONWEALTH vs. IRAM ALLEN

 
 Docket:
 2377CR00479
 
 
 Dates:
 August 28, 2025
 
 
 Present:
 William F. Bloomer
 
 
 County:
 ESSEX
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTIONS TO SUPPRESS
 
 

             The defendant, Iram Allen ("Allen"), is charged with second-degree murder. Allen, who was fifteen years old at the time of the alleged homicide, has filed three motions to suppress evidence. He moves to suppress all statements he made to police on August 22, 2023, with the exception of answers to standard booking questions following his arrest. He also moves to suppress the warrantless seizure of evidence by police on that same date. Finally, Allen moves to suppress the warrantless seizure and search of his cellphone, including suppression of any fingerprints and DNA lifted from the phone itself as well as the entirety of the phone's data and contents. With respect to each motion, Allen seeks suppression of any evidence derived from these searches and seizures.
            Following a hearing, and for the reasons set forth below, Allen's Motion to Suppress Statements (Paper No. 59) is ALLOWED IN PART and DENIED IN PART, Allen's Motion to Suppress Evidence Resulting from Warrantless Search and Seizure (Paper No. 60) is DENIED, and Allen's Motion to Suppress Evidence Resulting from Warrantless Seizure and Searches of Cell Phone (Paper No. 64) is ALLOWED IN PART and DENIED IN PART.
 
                                                            -1-
 
FINDINGS  OF FACT
            On May 17 and June 11, 2025, the court heard testimony from seven police witnesses, and it received twenty-seven exhibits in evidence. Allen did not testify. The court makes the following factual findings based on the credible evidence produced at the hearing and the reasonable inferences drawn from the evidence.[1] In making these findings, the court finds the testimony of Lynn Police Officers Tam Dinh (" Dinh"), Kenneth Pedone (" Pedone"), Thomas Morley ("Morley"), Lieutenant Ashley Affonco (" Affonco"), and Detective John Bernard ("Bernard"), and Massachusetts State Police Sergeants David Strong ("Strong") and Thomas Sullivan ("Sullivan"), truthful and accurate on the relevant and material points set forth below.
            At approximately 5:48 PM on August 22, 2023, Allen and three companions entered Alpha Convenience Store ("Alpha Convenience"), located at 1 Freeman Square in Lynn.[2] Within one minute of Allen and his companions entering the store, three males wearing face masks enter the store. Two of the males, later identified as Daniel Marquez (" Marquez") and Ranciel Castillo ("Castillo"), immediately approach and confront Allen while their companion follows them at a distance. Marquez, dressed in a white tee-shirt with his hair covered with a hat or cloth, pushes Allen backward and throws a punch at him, while Castillo, outfitted with a black sweatshirt with the hood pulled up, joins in the ensuing fray. Within seconds, Marquez hunches over and flees the store leaving a trail of blood behind. Marquez's and Castillo's companion, who also wore a dark-colored sweatshirt with the hood pulled up, follows close behind. Castillo
 
--------------------------------------------
 
[1] In addition to witness testimony, the parties introduced body-worn camera (BWC) footage, video recordings from surveillance cameras, the booking video and report of Allen, photographs, maps, the Lynn Police Inventory Policy for Persons in Custody , turret tapes, Allen' s Court Activity Record Information (CA RI), and a GrayKey Pro gress Report pertaining to Allen's cellphone.
[2] The court bases its factual findings of events occurring inside the store on its review of the establis hment 's surveillance camera footage. For the limited purposes of the motions, the court concludes that the surveillance footage depicts Allen and other subjects identified herein.
 
                                                            -2-
 
continues to fight Allen, however, before fleeing the establishment. Allen and his three companions then exit the store and leave the area. The entire incident took approximately thirty seconds to unfold.
            Lynn police responded to the incident at Alpha Convenience. The first officer at the scene, Officer Flores, arrived at approximately 5:53 PM. Flores sent two broadcasts over the radio, the first concerning a blood trail and the second concerning a group of four to five people fighting in the store. Exhibit ("Ex.") 20 (turret recordings). Flores broadcast over the radio that the incident did not involve a robbery, but the store was "destroyed" and commented again on the blood trail. The store closed, and officers immediately secured the crime scene. Dinh, Pedone, and other Lynn police officers responded to the store.
            Pedone and an Officer Chakoutis arrived at the store at approximately 5:54 PM.[3] A civilian informed Pedone that four people with masks and wearing black clothing went from Alpha Convenience down Union Street in the direction of Joyce Street. Pedone informed other officers, who commenced a search of the area to locate the individuals involved.
            Meanwhile, Dinh observed the interior of the store to be in disarray. Items were strewn about the aisles. Shelves were damaged. Blood was on the floor. On the ground in the aisle where the fight began, Dinh observed a knife handle and a cellphone next to one another and a short distance from the blood stains on the floor. Ex. 1. Dinh spoke to the clerk of the store, who was flustered and very anxious. She informed Dinh that a "bunch of kids" entered the store and started fighting. She initially stated six or seven boys were fighting, but then later told Dinh four or five people were involved in the fight. She stated it happened "so fast," and that the
 
--------------------------------------------
 
[3] The times referenced herein are taken from the time stamps on surveillance cameras at Alph a Convenience and officers' body-worn cameras. The court also references the radio broadcasts contained in Exhibit 20 (turret tapes).
 
                                                            -3-
 
group wore masks and were, "not white, not black ... not black/black."[4] Allen and his companions did not wear face masks while inside the store.
            Dinh and an Officer Risinariu viewed surveillance footage of the interior of the store together. Radio broadcasts indicated that police were "trying to get some video but they ran down Union towards Joyce." Dinh initially believed from his observations of the interior of the store that the cellphone on the floor belonged to the clerk, but Officer Risinariu pointed out from the video it was "the stabber's." The person believed to be "the stabber" wore a light-colored hooded sweatshirt, a fanny pack strapped across his chest, black sweatpants, and blue and white sneakers. It was Allen. Ex. 7 (photo from surveillance video). Dinh transmitted footage of the incident and a still photo of the screen depicting a portion of the footage to Detective Bernard.
            At approximately 5:57 PM, Pedone broadcast observing, "two parties with masks walking on Joyce towards Walgreens...." Pedone and Chakoutis stopped the two juveniles on Joyce Street, but determined the youths were not involved in the incident at the store.
            While these events were unfolding, Lieutenant Affonco had finished her shift and left work in her personal vehicle. Affonco saw two cruisers at the end of Buffum Street while looking in the direction of Union Street. As she drove along Essex Street, Affonco saw a group of three males cutting through a parking lot at Wayne Alarm. Affonco thought this was "odd" because people usually do not walk through that area. The group then exited Wayne Alarm through a gate and continued walking along Essex Street in the direction of Joyce Street. Affonco noted that although it was a warmer day, one of the individuals was pulling his shirt up
 
--------------------------------------------
 
[4] Dinh also obtained information from another individual, Melvin Gittens, at the scene who described three light- skinned individuals dressed in black and wearing hoodies and face masks. However, Dinh did not receive this information until around the same time Allen and his companions were stopped by officers approximately one-half mile from the store.
 
                                                            -4-
 
over his face. She also noticed that the three appeared excited and spoke in an animated fashion to one another while gesturing with their hands. The taller male in the group used a cellphone. The group kept looking behind themselves as if to check to see whether they were being followed. When she pulled her vehicle alongside the group, Affonco heard one of the males say, "I don't know but there was a lot of blood."
            Affonco saw a marked police cruiser stopped on Joyce Street. It belonged to Pedone and Chakoutis, who were speaking to the two youths they had stopped. Because she had no police- issued equipment in her personal vehicle, Affonco drove to the cruiser and informed Pedone and Chakoutis that she observed three males matching the description of those involved in the incident at Alpha Convenience walking up Essex Street. She told them, "they just cut through Wayne Alarm." Ex. 9 at 17:58:20. Chakoutis responded that he could see them, pointing down Joyce Street in the direction of Essex Street.
            Pedone observed the three males moving quickly along Essex Street.[5] At approximately 5:58 PM, he broadcast over the radio that, "three more parties in all dark clothing right now ... going towards Joyce, Essex ... heading up towards Essex to a [inaudible] store right there. Could you get another car to stop them? They're in a hurry." Around this same time, a radio transmission informed officers that the "victim was stabbed, is at the Fayette fire station in a white Toyota Corolla "
            Morley and other officers from the bicycle patrol unit, including an Officer Williams ("Williams"), arrived and spoke to Pedone, who relayed to them the information about the group heading up Essex Street. Morley, who had heard the earlier radio broadcasts, and Williams rode their bikes onto Essex Street. They observed three individuals walking up Essex Street toward
 
--------------------------------------------
 
[5] Ex. 9 at 17:58:34 shows the group walking rapidly up Essex Street in the direction of Tilton Terrace.
 
                                                            -5-
 
Tilton Terrace in the direction Pedone indicated and matching the general description broadcast over the radio. Morley pulled his bike alongside the three males, one of whom was Allen. He and other officers in the bicycle patrol unit had their badges affixed to their vests and " Lynn Police" clearly displayed on their bikes. Morley pulled in front of the three and asked them to stop while Detective Bernard, who had arrived separately in his unmarked police vehicle, approached the three males from behind with his badge displayed. Bernard identified himself as "Lynn police," and instructed the three males to stop. Allen appeared to contemplate running, so Morley instructed him not to run. Allen complied. Bernard and Morley noticed that Allen and his two companions were breathing heavily and sweating.[6]
            After instructing the youths to stop, Bernard observed Allen drop a light-colored sweatshirt and a fanny pack to the ground. Morley informed Allen and his two companions, who were later identified as Derek Ortiz and Jahquan Forbes, that they matched the general description of individuals involved in crime at a convenience store. Bernard explained that a stabbing had occurred. He initially instructed the three youths to take a seat on an elevated portion of a lawn at the corner of Essex Street and Tilton Terrace ("Essex and Tilton").[7] Bernard then had Allen, Ortiz, and Forbes stand up so a patfrisk could be conducted. No weapons were found on Allen. Police found a double-edged switch blade knife on one of Allen's companions. After pat frisking the males, police informed Allen and his companions that they were being temporarily detained and to resume sitting on the lawn at the corner of Essex and Tilton. See Exs. 21 and 22.
 
--------------------------------------------
 
[6] Morley asked Allen and his companions why they were sweating but could not recall their response.
[7] Tilton Terrace and Tilton Place are two different streets. See Exs. 14 and 15 (maps). Witnesses testified to the location of Essex Street and Tilton Terrace. In the interest of clarity and uniformity, the court references Tilton Terrace.
 
                                                            -6-
 
            At 6:00 PM, Bernard broadcast over the radio, "I got three kids at Essex and Tilton." Morley and Bernard both observed a cut near Allen's eyebrow, suggesting he may have been involved in a fight. At approximately 6:01 PM, Morley asked Allen what happened to the side of his head, and Allen responded, "I hit my head running." Ex. 19.
            Other officers also had arrived on scene. In addition to Bernard, Morley, and Williams, approximately six uniformed police officers responded to assist. They stood in front of the youths on Tilton Terrace and to the side of the group on Essex Street. Marked and unmarked cruisers and two police bicycles were stationed in the area of the intersection as well.
            Williams then began asking the males for their names, dates of birth, and addresses. Police asked Allen and his friends how old they were, and they responded fifteen, with Allen adding that he would turn sixteen in October. Allen asked officers why they were being stopped, and Morley replied that a crime occurred, that Allen and his friends matched the description of those involved in the incident, and police were waiting to receive videos to determine whether the three participated in the crime. Ex. 18 at 18:09:22.
            While the group remained seated on the lawn, an intoxicated individual arrived and asked Allen if Allen wanted him to call his mother. Allen began to give his mother's cellphone number to this individual. Morley asked Allen if he really wanted this intoxicated person, whom Morley described as a "character," to have his mother's phone number. Allen elected not to provide the number to this person.
            At approximately 6:05 PM, officers transmitted over the radio that they "were working on the video right now," and were "sending the pictures over right now."
            After participating in the stop of Allen and his companions, Bernard responded to a firehouse at the intersection of Essex and Fayette Streets, where the victim of a stabbing was
 
                                                            -7-
 
located. Upon his arrival, Bernard observed Marquez being placed in an ambulance. Bernard then spoke to an Officer Craven, who stated that there were four males in a car, one of whom was Marquez, and two others remained seated nearby. Bernard then spoke to Castillo, who was the only one in the group over the age of eighteen years. Castillo told Bernard that Marquez had been stabbed in Alpha Convenience. Castillo explained he, Marquez, and their two friends, Yeferson Cambar and Carlos Cornielle, drove along Union Street from Exchange Street. Castillo stated that four people standing in front of the convenience store were "talking shit" in the direction of their car. The four people then entered Alpha Convenience. Castillo, Marquez, and one of the males then exited their motor vehicle after stopping on Baldwin Steet. They also entered the convenience store. A fight ensued. Afterwards, Castillo and his friends fled the store and re-entered their car. Castillo, being the last to arrive at the car, saw one of his companions holding a cloth on Marquez's chest. Castillo said there was blood everywhere.  Castillo instructed the driver to go to the hospital. On the way, they drove by the firehouse and Castillo instructed the driver to stop there to obtain assistance from emergency personnel. Firefighters were not present at the station, however, having been called out to respond to an incident. Castillo and his companions then placed an emergency 911 call and police arrived at the fire station. Castillo told Bernard that he did not know the people he and his friend fought, and that he was "just backing up [his] friend."
            While at the firehouse, Bernard also observed a still image and some video footage taken from Alpha Convenience surveillance cameras that were sent to him by Dinh. See Ex. 3.
Bernard also requested and received photographs of the three youths stopped at the corner of Essex and Tilton for comparison purposes. Bernard and Sergeant Mark Nerich reviewed the images and concluded that Allen was the person who stabbed Marquez. Bernard then returned to
                                                            -8-
 
the street corner and placed Allen under arrest for assault and battery by means of a dangerous weapon.
            Officers Torres and Perry took custody of Allen and pat frisked him again before placing him in their cruiser. Although difficult to discern from the BWC footage, it appears Allen informed Torres and Perry that he "peed the bathroom out there," indicating he urinated on himself during the stop. At fifteen years of age, he had no record of delinquency adjudications or criminal convictions. See Ex. 26 (Allen's CARI).
            Police collected the light-colored hooded sweatshirt and fanny pack Allen dropped to the ground. Sergeant Nerich transported the items to the Lynn Police Department. Officers also transported Allen to the Lynn Police Department, where he was booked and fingerprinted. See Ex. 12 (booking report). During the booking procedure, Allen engaged officers in casual conversation. Before being placed alone in a juvenile detention cell, Allen' s sneakers and other items, such as the waistband on his sweatpants, were taken from him.
            The Lynn police eventually provided the sweatshirt and Allen's sneakers to the Massachusetts State Police ("MSP") but maintained custody of the fanny pack Allen dropped to the ground as evidence. Bernard initially pat frisked the fanny pack, which had a soft outer shell, before logging the item into evidence. He felt the contours of a knife. He then opened the fanny pack and found a kitchen knife inside. He placed the fanny pack and knife in separate evidence bags. He then stored the items in a locked closet inside the Lynn Detectives Office.
            Marquez succumbed to his injuries sometime before 7:00 PM. After receiving word of Marquez's death and that a suspect (Allen) was in custody, MSP Sergeant Strong responded to the Lynn Police Department, arriving at approximately 7:00 PM. Strong is a member of the State Police Detectives Unit assigned to the Essex County District Attorney' s Office, which
 
                                                            -9-
 
investigates homicides and unattended deaths. He has been a trooper for thirteen years, serving in the MSP Detectives Unit since 2018. Bernard briefed Strong on the investigation up to that point. Strong viewed the surveillance footage from Alpha Convenience. Ex. 3. He took possession of the sweatshirt Allen dropped to the ground and Allen's sneakers. Strong also requested to speak with Allen, but Allen's mother, who had arrived at the police station, declined permission.
            Meanwhile, Lynn police had secured the scene until troopers assigned to the District Attorney's Office and personnel from the MSP's Crime Scene Services Section arrived. At approximately 8:00 PM, a member of the MSP's Crime Scene Services, a Trooper Cunniff, responded to Alpha Convenience. He recovered the cellphone, which was an Apple iPhone, from the floor of Alpha Convenience after the scene was processed. Cunniff dusted the phone for latent fingerprints and swabbed it for potential DNA. A Trooper Orlando then took custody of the device and transported it to the MSP's office in Salem, arriving around 11:00 PM. Strong could not recall if Orlando secured the device by placing the iPhone in airplane mode or turning the device off. After the device was logged into evidence, it remained inside a case file on Strong's desk in his cubicle at the MSP office until August 31, 2023, when Strong turned the device over to Sergeant Sullivan. Strong knew various methods to protect against remote data wiping of a cellphone, including placing the phone in a Faraday bag, removing the SIM card, or placing the device in airplane mode to disable access to the internet. Police undertook no precautions, however, to guard against the remote wiping of data from the phone.
            Trooper Cunniff issued a report, dated August 31, 2023, concluding that at least one latent fingerprint found on the cellphone matched Allen's fingerprint. On that same date, Strong provided the cellphone to Sergeant Sullivan, who began an extraction and download of the
 
                                                            -10-
 
phone's contents and data using "GrayKey" forensic access software. See Ex. 27 (GrayKey Progress Report). Allen's iPhone was password protected. GrayKey attempted twice to crack the password on Allen's iPhone using "brute force" without success. Sullivan nevertheless could perform a "before first unlock" extraction and download using GrayKey.[8] Approximately twenty-one gigabytes of information was extracted from Allen's iPhone. GrayKey created a Zip file containing the extracted contents of the iPhone and a separate "GrayKey Progress Report," which identified Allen as the owner of the device. Sullivan then used "Cellebrite" software to create a "reader report" and loaded it onto a thumb drive. He provided the thumb drive to Strong.
            Using the Cellebrite program, Strong viewed the reader report and examined the downloaded contents of the data extracted from the phone. Strong could view Allen's "contacts" and a significant number of messages in the social media application Snapchat as well as some videos and photographs stored in the device.[9] Strong's examination took place around the time he received the thumb drive containing the reader report from Sullivan at the end of August 2023. Strong could not recall the date range for the Snapchat messages, however. During his review of the Snapchat messages, Strong came upon the names of two people, Themain Grizzle
 
--------------------------------------------
 
[8] There are two different unlock states typically seen during a forensic examination of a cellphone, the first being a "before first unlock" and the second being an "after first unlock." An after first unlock download occurs after the phone is powered on and the password is entered. The before first unlock download occurs when the phone is powered off, loses power, or the user has not entered the password for a set period of time. Investigators typically uncover far more data from a cellphone during an examination involving an after first unlock download. Variables also come into play, including the make and model of the phone and the age of its operating system.
[9] A search warrant was issued for Snapchat records. The present motions raise no challenge to that warrant, however, and a copy of the warrant was not introduced in evidence at the suppression hearing. This court's decision, therefore, does not address any challenge to the validity of that warrant.
 
                                                            -11-
 
and Amaury Perez.[10] He subsequently acquired contact information for these individuals and interviewed them.
            Although Strong had no information that the opposing factions involved in the fight at Alpha Convenience communicated with each other over social media platforms, he was aware that, with the exception of Castillo, who was older, the individuals from the two groups knew each other from attending Lynn English High School and middle school together.
            Additional factual findings are integrated in the following Rulings of Law.
RULINGS OF LAW
            Allen moves to suppress all statements he made to the police on August 22, 2023. (Paper No. 59). He also seeks suppression of all items seized by police, including the light-colored colored hooded sweatshirt, the fanny pack and its contents, and his blue and white colored sneakers (Paper No. 60). Finally, Allen moves to suppress the warrantless seizure and search of his cellphone, including suppression of any fingerprints and DNA lifted from the phone itself as well as the entirety of the phone's data and contents (Paper No. 64). He also seeks suppression of any evidence derived from these searches and seizures.
            The Stop and Detention of Allen
            The court concludes that the stop and detention of Allen and his companions were lawful. The court's first task is to determine the moment when police "seized" Allen for constitutional purposes. "Identifying the moment of seizure is a critical question for purposes of deciding a motion to suppress." Commonwealth v. Jones-Pannell, 472 Mass. 429,432 (2015). "A person is 'seized' by police if, in view of all of the circumstances surrounding the incident, a reasonable person would not believe that he was free to leave." Commonwealth v. Ramirez, 92 Mass. App.
 
--------------------------------------------
 
[10] Strong also learned of the Snapchat handles "Fee RZ" and "KSO," but he did not identify the individuals associated with those handles.
 
                                                            -12-
 
Ct. 742, 744 (2018). A reasonable person in Allen's position would not have felt free to leave when Morley and Bernard blocked the group's progress from in front and behind, identified themselves as police officers, and ordered the group to stop - regardless of Allen's status as a juvenile. See Commonwealth v. Stoute, 422 Mass. 782, 789 (1996) (explaining that stop in constitutional sense occurs when police action, "objectively considered, indicates to a person that he would not be free to leave the area (or to remain there) without first responding to a police officer's inquiry.").
            In any event, it was objectively apparent to the officers that Allen and his companions were juveniles. See Commonwealth v. Evelyn, 485 Mass. 691, 692-693 (2020) (age of juvenile suspect, if known to officer or objectively apparent to reasonable officer, relevant to whether juvenile was seized under art. 14). In fact, Bernard broadcast over the radio that he had three "kids" stopped at Essex and Tilton. Morley instructed Allen not to run when it appeared he was contemplating fleeing. The officers' show of authority, including blocking the youths' path and ordering them to stop, objectively communicated to Allen, a juvenile, that he was not free to leave. See Ramirez, 92 Mass. App. Ct. at 744) (stating that "when the police issue commands to stay put, they seize whomever they address.") (citations omitted).
            "An investigatory stop is justified only if the police have reasonable suspicion to conduct the stop." Commonwealth v. Pinto, 476 Mass. 361,363 (2017). "Reasonable suspicion exists when an officer, based on specific, articulable facts and reasonable inferences therefrom, in light of the officer' s experience, has reasonable grounds to suspect 'a person is committing, has committed, or is about to commit a crime."' Id. at 363-364, quoting Commonwealth v. Gomes, 453 Mass. 506, 511 (2009). "A court considers whether there was reasonable suspicion for police to conduct a stop 'in an ordinary, commonsense manner without hypertechnical
 
                                                            -13-
 
analysis."' Commonwealth v. Westgate, l 01 Mass. App. Ct. 548, 551 (2022), quoting Commonwealth v. Gonzalez , 93 Mass. App. Ct. 6, 11 (2018). Such an analysis takes into consideration the totality of the circumstances surrounding the encounter. Commonwealth v. Matta, 483 Mass. 357, 362 (2019).
            Here, the police had reasonable suspicion to conduct the stop of Allen and his companions. first, Allen and his friends were in close geographical and temporal proximity to the location of the crime at the time of the stop. Police stopped a group of three individuals dressed in dark clothing approximately ten minutes after the violent altercation and one-half mile from Alpha Convenience. See Evelyn, 485 Mass. at 704-705 (finding geographic and temporal support for stop occurring thirteen minutes and one-half mile from location of shooting). The group walked "in a hurry" in the general direction indicated by a witness and away from the establishment. The number of people stopped as well as their manner of dress were not materially inconsistent with accounts provided by the store clerk and other witnesses. [11]
            Second, the conduct and words of Allen and his companions provide considerable support for the stop. Affonco observed a group of three males who roughly matched the description of individuals involved in the melee cutting through Wayne Alarm and walking up Essex Street towards Joyce Street while looking over their shoulders as if to check to see whether they were being followed. It was a warm day, but one of the individuals was pulling his shirt up over his face. The three males appeared excited - gesticulating to one another while engaged in
 
--------------------------------------------
 
[11] It appears from the record presently before the court that witnesses gave police descriptions of Marquez and his companions. The clerk told Dinh that the group wore masks and were, "not white, not black ... not black/black." Pedone obtained information from another person, who stated that four people with masks and wearing black clothing had left Alpha Convenience and proceeded down Union Street in the direction of Joyce Street. Allen and his companions did not adorn face masks while in the store and he and at least one of his companions appear to be African American. Nevertheless, with the information available to police in the immediate aftermath of a violent altercation, it was not unreasonable for officers to comb the area for a group of individuals matching the number and dress of those involved in the incident. Facemasks, moreover, can easily be removed and discarded.
 
                                                            -14-
 
a discussion. Affonco pulled alongside the group in her personal vehicle and overheard one of the males say, "I don't know but there was a lot of blood." It is reasonable to infer from such a statement that members of the group were involved in, or at the very least had personal knowledge of, the bloody altercation that had just occurred in Alpha Convenience. After speaking to Affonco, Pedone broadcast the group's rapid advancement along Essex Street, and Morley, Williams and Bernard located Allen and his companions within two minutes of Pedone's radio transmission.
            The court is not persuaded by Allen's argument that Affonco's observations and communications to her fellow officers cannot be considered under the horizontal collective knowledge doctrine. Affonco involved herself in the collective response to a report of a violent crime at Alpha Convenience. That she was off-duty, in her personal vehicle, and without police- issued equipment does not negate the application of the horizontal collective knowledge doctrine, at least in the circumstances of this case. After completing her shift and leaving the station just before 6:00 PM, Affonco took it upon herself to follow people acting suspiciously and engaging in an animated discussion. She overheard one of those involved in the excited exchange make a comment about an incident that involved "a lot of blood." Affonco had no radio to broadcast her observations or other police-issued equipment in her personal vehicle, so she drove to nearby officers and told them that individuals matching the description of those involved in the incident at Alpha Convenience "just cut through Wayne Alarm" and were heading up Essex and crossing Joyce. Pedone relied on the information communicated by Affonco to direct other officers to conduct a stop of Allen and his companions. In these circumstances, the court concludes Affonco's knowledge properly is imputed to Pedone and other officers engaged in the ongoing efforts to locate those involved the violent assault. See
 
                                                            -15-
 
Commonwealth v. Privette, 100 Mass. App. Ct. 222, 227-228 (2021) (one officer's knowledge of suspect' s description imputed to another officer under collective knowledge doctrine even if never communicated, where both officers were involved in collective response to armed robbery); Richardson v. Boston, 53 Mass. App. Ct. 201, 206 (2001) (in determining whether police have reasonable suspicion for making a stop, knowledge of each officer treated as common knowledge of all officers and must be examined to determine whether reasonable suspicion exists).
            Finally, public safety considerations, while likely not sufficient in and of themselves to justify a stop, also tip the scales in favor of reasonable suspicion. See Evelyn, 485 Mass. at 704- 705 (potential ongoing risk to public safety weighed in favor of reasonable suspicion); Commonwealth v. Meneus , 476 Mass. 231,239 (2017) (gravity of crime and present danger of circumstances properly considered in reasonable suspicion calculus but "public safety exception" not yet carved out). Here, police responded within minutes to the report of a violent confrontation between two groups inside a convenience store. It was just before 6:00 PM, and the establishment was in disarray. Officers observed a knife handle near a trail of blood on an aisle floor as well as a knife blade located outside the store on the sidewalk. Those involved in the bloody altercation remained at large. While not a determinative factor, the potential ongoing risk to public safety in these circumstances contributes to the reasonable suspicion calculus.
            Having determined that a stop occurred in the constitutional sense and that the police possessed reasonable suspicion to effectuate the stop, the court next turns to whether the scope of the stop was reasonably related to the circumstances that justified the initial intrusion. Allen argues that the level of police presence, coupled with the restraint of his freedom of movement, transformed the stop into an arrest without probable cause. The court disagrees.
 
                                                            -16-
 
            An investigatory stop "does not automatically become an 'arrest' simply because the defendant is not free to leave." Commonwealth v. Sinforoso, 434 Mass. 320, 325 (2001). "Whether a stop is a seizure, requiring reasonable suspicion, or an arrest, requiring probable cause, depends upon the circumstances of each case." Commonwealth v. Manha, 479 Mass. 44, 48 (2018). " In determining whether the defendant was under arrest, we consider ' whether the intrusiveness of the seizure was proportional to the degree of suspicion that prompted the intrusion.' .. . More specifically, we consider 'the length of the encounter, the nature of the inquiry, the possibility of flight, and, most important, the danger to the safety of the officers or the public or both.'. . ." Commonwealth v. Vellucci, 98 Mass. App. Ct. 274, 276 (2020) (citations omitted).
            Here, the nature of the inquiry involved a stabbing that occurred approximately ten minutes before the stop of Allen and his companions. The group engaged in a heated discussion while walking away from Alpha Convenience and looking over their shoulders. One member of the group pulled his shirt up over his face despite the warm temperatures, and Affonco overheard a comment about "a lot of blood." Allen had a cut over his eye and, when first stopped, he appeared to contemplate fleeing. He also dropped his sweatshirt and a fanny pack to the ground after being instructed to stop. The whereabouts of the perpetrator of the stabbing and his companions were unknown. Given the gravity of the quickly unfolding situation and the ongoing risk to public safety, a robust police response in stopping Allen and his companions, even at their young age, was not disproportionate to the degree of suspicion that prompted the intrusion. See Commonwealth v. Willis, 415 Mass. 814, 820-821 (1993) (showing firearm or presence of numerous officers warranted when stopping individual suspected of participating in crime associated with weapons). Additionally, in response to questions about why they were
 
                                                            -17-
 
being stopped, police informed the group that they were being detained because they matched the descriptions of individuals involved in a nearby incident and were awaiting production of surveillance video, not that they were under arrest. No handcuffs or other physical restraints were used. Compare Vellucci, 98 Mass. App. Ct. at 276 (use of handcuffs is not dispositive on the question whether and when a stop has been transformed into an arrest). The police did not unholster their firearms, the tone of the conversation was casual, and the questions were not asked in an aggressive or intimidating manner.
            The court further finds that the length of time the youths were detained did not transform the Terry stop into an arrest. "' In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."' Commonwealth v. Feyenord, 445 Mass. 72, 81 - 82 (2005), quoting United States v. Sharpe, 470 U.S. 675,686 (1985); see Commonwealth v. Barros, 425 Mass. 572, 583-584 (1997) (detaining group for fifteen minutes to present them to witnesses permissible). '" A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing.' ... ' What is reasonable within the principle of threshold inquiry must be decided in each case." ' Sinforoso, 434 Mass. at 325, quoting Commonwealth v. Salerno, 356 Mass. 642, 646 (1970).
            The police acted with due dispatch in the circumstances of this case. The incident at Alpha Convenience occurred at approximately 5:49 PM. The stop of Allen and his two companions occurred at approximately 6:00 PM, about one-half mile from the store.[12] Bernard
 
--------------------------------------------
 
[12] Bernard's radio broadcast related to stopping the three youths occurred at 6:00 PM, and footage from BWCs worn by Officers Perry and Torres show the two arriving in their cruiser at the intersection of Essex and Tilton at
 
                                                            -18-
 
arrested Allen at approximately 6:35 PM. This court concludes police did not unreasonably prolong the encounter in seeking to confirm or dispel their initial reasonable suspicion.
            Here, officers effectively had to respond to three separate scenes: (1) the location of the violent altercation at Alpha Convenience, (2) the stop of Allen and his companions at the corner of Essex and Tilton, and (3) the fire station at the corner of Essex and Fayette Streets, where Castillo and his companions sought medical assistance for Marquez. After stopping Allen and his two friends, Bernard saw Allen drop a light-colored sweatshirt and a fanny pack to the ground. The three males were sweating and breathing heavily. Allen appeared to contemplate fleeing, and Morley and Bernard both observed a cut near Allen's eyebrow, indicating he may have been involved in a fight. These observations justified further detaining the group while police worked to confirm or deny their suspicions that Allen and his companions were involved in the melee at the store. See Grasso, Suppression Matters,§ 4-4(b] (2022 Ed.) (observations made during course of stop may give rise to heightened suspicions justifying greater intrusions).
            While these events were unfolding, other officers interviewed witnesses and reviewed footage from Alpha Convenience's surveillance cameras. Dinh sent a still photograph from the footage as well as a video clip of the fight inside the store to Bernard. The photograph and clip show Allen wearing a light-colored sweatshirt and fanny pack inside the convenience store similar in appearance to those he dropped to the ground. After interviewing Castillo and comparing photos of the youths to surveillance camera footage and a still image taken from that footage, Bernard and Sergeant Nerich determined Allen was the individual who stabbed Marquez. Bernard then returned to the comer of Essex Street and Tilton Terrace and placed
 
--------------------------------------------
 
approximately 6:02 PM. See Exs. 13 and 18. By that time, Allen and his companions were already seated on a lawn encircled by a small concrete barrier with uniformed and bicycle officers positioned around them.
 
                                                            -19-
Allen under arrest. In short, police diligently took the necessary steps '"to confirm or deny their suspicions quickly, during which time it was necessary to detain [Allen]."' Feyenord, 445 Mass. at 81.
            The Seizure of the Sweatshirt, Fanny Pack, and Other Items
            The court concludes that the seizure of the sweatshirt and fanny pack, as well as the subsequent search of the fanny pack itself, were lawful. After observing Allen, interviewing Castillo, and viewing the surveillance video, Bernard had probable cause to arrest Allen for assault and battery by means of a dangerous weapon. See Commonwealth v. Maria, 97 Mass. App. Ct. 490, 494 (2020) ("Probable cause exists when police know of 'enough facts and circumstances to warrant a person of reasonable caution in believing that the defendant had committed or was committing a crime."').
            The seizure of the light-colored sweatshirt and fanny pack was justified incident to Allen's arrest. Under G.L. c. 276, § 1, "[a] search conducted incident to an arrest may be made only for the purposes of seizing fruits, instrumentalities, contraband and other evidence of the crime for which the arrest has been made, in order to prevent its destruction or concealment; and removing any weapons that the arrestee might use to resist arrest or effect his escape."  The light- colored sweatshirt and fanny pack Allen dropped to the ground, which were consistent with those worn by the person who stabbed Marquez, could be seized as evidence. See Commonwealth v. Tremblay, 480 Mass. 645,662 (2018) ("[P]olice may seize a defendant's clothing incident to arrest if they have 'probable cause to believe that the [clothing] was connected to the crime."'). The seizure of these items occurred substantially contemporaneous with Allen's arrest.[13] See Commonwealth v. Darosa, 94 Mass. App. Ct. 635,641 (2019) (search
 
--------------------------------------------
 
[13] The seizure of Allen's sneakers and other items from his person after he was booked but before he was placed in a cell was also justified incident to his arrest, despite the fact that the seizure did not occur until after he arrived at the
 
                                                            -20-
 
incident to arrest can precede formal arrest if search and arrest are substantially contemporaneous).
            Once lawfully in the possession of the police, Bernard could search the fanny pack incident to arrest or, at the very least, pat frisk the fanny pack for weapons before logging it into evidence. The fanny pack itself was small, pliable, and soft to the touch. Bernard had pat frisked numerous packages and bags in the past as a detective and felt the handle and edge of a knife upon patting down the outer shell of the bag. Removing the item from the fanny pack in these circumstances did not constitute a further intrusion into Allen's privacy. See Wilson, 441 Mass. at 392-399 (if object's contraband identity is immediately apparent to officer, there is no further invasion of suspect's privacy beyond that already authorized by officer's search for weapons).[14]
            The Search and Seizure of Allen's Cellphone
            Allen challenges the legality of investigators' : (1) seizure of the cellphone; (2) dusting it for fingerprints and swabbing it for DNA; (3) and search of the phone's contents. He also seeks suppression of all evidence derived from the warrantless search of his iPhone. For the reasons explained below, the court concludes that the seizure of the cellphone and the dusting of its exterior for fingerprints and swabbing for DNA were lawful, but that the search of the phone's contents without a warrant was not.
 
--------------------------------------------
 
police station. See United States v. Edwards, 415 U.S. 800, 803 (1974) ("searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention"); Commonwealth v. Berry, 463 Mass. 800, 806 (2012) (search incident to arrest of person and items found on him may take place not only contemporaneously with arrest but also at later point at police station).
[14] At the hearing, the Commonwealth introduced in evidence the Lynn Police Department's written inventory policy (Policy No. 26.2). Ex. 11. In its memorandum filed after the hearing, however, the Commonwealth does not advance the argument that the search of the fanny pack was lawful under Policy No. 26.2. The court does not address the issue given its conclusion that the search incident to arrest exception applies here.
 
                                                            -21-
 
            To determine whether the seizure and search of the cellphone violated the Fourth Amendment and art. 14, the court must first determine whether a search in the constitutional sense took place. Commonwealth v. Porter P., 456 Mass. 254, 259 (2010). "This determination turns on whether the police conduct has intruded on a constitutionally protected reasonable expectation of privacy." Id., quoting Commonwealth v. Montanez, 410 Mass. 290,301 (1991). "The measure of the defendant's expectation of privacy is (1) whether the defendant has manifested a subjective expectation of privacy in the object of the search, and (2) whether society is willing to recognize that expectation as reasonable." Commonwealth v. Molina, 459 Mass. 819,824 (2011). "The defendant bears the burden of establishing both elements." Montanez, 410 Mass. at 301. "If no one has a reasonable expectation of privacy in the place searched, the police are free to search that place without a warrant and without probable cause, as often as they wish." Porter P., 456 Mass. at 259. "If a defendant has a reasonable expectation of privacy, the police may search the place, in the absence of exigency, only with a warrant supported by probable cause or with consent." Id.
            The court concludes that the initial seizure of the cellphone was justified, and that Allen had no reasonable expectation of privacy in the physical device itself when it was seized from the floor of the crime scene, a store open to the public. The court first notes that the evidence before it does not support the contention that Allen abandoned the phone, thus giving up his expectation of privacy in the contents of the phone. "Abandonment occurs only when ... a defendant has 'voluntarily given up all control over the [property]."' Commonwealth v. Ferguson, 410 Mass. 611,615 (1991), quoting Commonwealth v. Battle, 365 Mass. 472,475 (1974).
 
                                                            -22-
 
            Here, surveillance footage shows Allen removing the cellphone from his pocket and entering something into the device when he first entered Alpha Convenience. Allen then returned the phone to his pocket. During the fight with Marquez and Castillo, the cellphone appears to fall from Allen's pocket to the floor and bounce on the ground. It ultimately comes to rest near the knife handle and the trail of blood on the floor. Allen then left the phone on the floor in his haste to flee the scene.
            There is no evidence before the court to suggest Allen deliberately or voluntarily left the phone on the floor to avoid detection. Compare United States v. Small, 944 F.3d 490 (4th Cir. 2019) (phone abandoned where evidence was that defendant had purposefully discarded incriminating personal items, including phone, to avoid detection in flight from police), with United States v. Turner, No. 3:24-cr-00008, 2024 WL 2599298 (W.D. Va. May 24, 2024) (phone not abandoned where evidence was that defendant dropped his phone during carjacking confrontation with victim driver). The cases relied upon by the government addressing abandonment of a cellphone are distinguishable. See Commonwealth v. Martin, 467 Mass. 291, 303-304 (2014) (defendant abandoned phone he placed on windowsill which he told police was not his and he did not want it anymore); Commonwealth v. Paszko, 391 Mass. 164, 184 (1984) (defendant abandoned jacket left in motel room after rental period expired and removed by motel staff).
            While Allen did not give up his expectation of privacy in the contents of the phone through abandonment, he still lacked a reasonable expectation of privacy in the exterior of the phone at the time of its seizure by leaving it in a public place, even accidentally. See Commonwealth v. Rodriguez, 456 Mass. 578, 587 (2010) ("No one has a reasonable expectation of privacy in items retrieved from the ground on a public park."); Commonwealth v. Krisco
 
                                                            -23-
 
Corp., 421 Mass. 37, 42-43 (1995) ("It is well established that, in general, government agents may make a warrantless search of areas in which the public has free access . . . "); Commonwealth v. Sheridan, 75 Mass. App. Ct. 1105 (2009) (unpublished Rule 1:28 decision) (motion to suppress knife properly denied where defendant had no reasonable expectation of privacy in knife seized in plain view from public sidewalk, in area "defendant did not own, did not control, and which was freely accessible by others"). Assuming Allen retained a subjective expectation of privacy in the cell phone when he dropped it in the store, society (per the case law) does not recognize that expectation as reasonable. As Allen himself acknowledges in his memorandum, "Digital data is distinct from the device that accesses it." Paper No. 73., Def. Post-Hearing Memorandum at *70. The physical device is like any other object left behind at a crime scene, such as the knife handle, and its surface can be examined and tested as such.
            At bottom, the police acted reasonably in searching the surface area of the cell phone for DNA and latent fingerprints. See Commonwealth v. Moore, 54 Mass. App. Ct. 334, 340 (2002) ("ultimate touchstone of art. 14 and the Fourth Amendment is whether a search or seizure was reasonable in the circumstances."). Application of the exclusionary rule in these circumstances is not appropriate. See Commonwealth v. Santiago, 470 Mass. 574,578 (2015) (primary purpose of exclusionary rule is to deter future police misconduct by barring admission of evidence that police have obtained in violation of rights protected by Federal and State Constitutions). For these reasons, suppression of the fingerprints and DNA obtained during the search of the exterior of the cell phone is not required.
            The court reaches a different conclusion with respect to the search of the cellphone' s contents on August 31, 2023. Cellphones, particularly so-called smart phones like Allen's, are now miniature computers capable of storing vast amounts of information, some of which can be
 
                                                            -24-
 
highly personal and confidential in nature, including intimate photographs, family videos, personal contacts, notes, medical records, and financial statements. Searching a cellphone can uncover a virtual treasure trove of information about the user's private life. Here, Allen's cellphone was a password-protected Apple iPhone, which has enhanced security features, including data encryption. Investigators' attempts to crack the password to the phone using GrayKey software twice failed. Police nevertheless extracted approximately twenty-one gigabytes of information from Allen's iPhone. This amount of data translates into hundreds of thousands of printed documents, depending on the types of files extracted. The GrayKey Progress Report alone generated the cellphone's number, listed Allen as owner, and identified the iCloud account associated with the phone (Allen's email address).
            While Allen lost any reasonable expectation of privacy in the exterior of the phone itself by leaving it behind in the store, the court concludes that he nevertheless maintained a reasonable expectation of privacy in the electronic contents of the phone.[15]
            Generally, the police are required to obtain a warrant before searching a person's cellular telephone. Riley v. California, 573 U.S. 373,401 (2014) ("a warrant is generally required before [a search of a cell phone]"). "If the Commonwealth conducts a search or seizure without first obtaining a warrant, the search or seizure is 'presumptively unreasonable' and, therefore, presumptively unconstitutional." Commonwealth v. White, 475 Mass. 583, 588 (2016), quoting Commonwealth v. Craan, 469 Mass. 24, 28 (2014). A warrantless search " may be justified if the Commonwealth can demonstrate that the search or seizure ' falls within a narrow class of permissible exceptions to the warrant requirement.'" Tremblay, 480 Mass. at 662, quoting White,
 
--------------------------------------------
 
[15] Given the court's conclusion, it is not necessary to reach Allen's argument that the abandonment doctrine should not apply to searches of digital data accessed from password-protected cellphones.
 
                                                            -25-
 
475 Mass. at 588. The Commonwealth bears the burden of proving that a warrantless search is reasonable. See Commonwealth v. Abdallah, 475 Mass. 47, 51 (2016).
            Here, the Commonwealth has failed to demonstrate that the search of the contents of the phone falls within one of the exceptions to the warrant requirement. When police accessed the phone's contents, nine days had elapsed since the incident. Any potential exigency ceased to exist.[16] At that time, investigators had reason to believe the phone belonged to the perpetrator and that the perpetrator was Allen. They also had surveillance footage showing Allen using the phone in the store immediately before the fight, and they recovered Allen' s fingerprint from the device found at the scene of the stabbing. This is precisely the type of evidence that would have formed the basis for a finding of probable cause to search the cellphone, had it been included in an affidavit in support of a search warrant application. See Commonwealth v. Henley, 488 Mass. 95, 115 (2021) (affidavit supporting application for warrant established probable cause to believe device had been used before or during commission of crime in question and established sufficient nexus between criminal activity and device); Commonwealth v. Louis, 487 Mass. 759, 764 (2021) (probable cause existed where affidavit established that coventurers communicated by text messages and cell phone calls before and during alleged crimes; coventurer said he called defendant on day of the crime; and defendant was identified in affidavit as person who bought gun and shot the victim); Commonwealth v. Snow, 486 Mass. 582, 587 (2021) (police had probable cause to search defendant's cell phone based on defendant's phone call shortly after crime had been committed to person who had rented getaway car, and based on inference that joint-venture crime was planned ahead of time). For some reason, however, the police went
 
--------------------------------------------
 
[16] As previously noted, Strong was aware of different methods available to protect the phone from having its data remotely wiped during the nine-day period.
 
                                                            -26-
 
ahead with their search of the phone without obtaining a warrant. As there was no justification for their doing so, the contents of the cellphone must be suppressed.
            Having determined that the warrantless search of the contents of Allen' s iPhone was not constitutionally permissible, the fruits of that search also must be suppressed. Wong Sun v. United States, 371 U.S. 471, 487-488 (1963). Here, Strong identified two people, Themain Grizzle and Amaury Perez, from his review of the Snapchat messages extracted from Allen's phone. He then acquired contact information for these individuals and interviewed them. The information Strong received from Grizzle and Perez, presumably unfavorable to Allen, is also subject to suppression. On this record, the Commonwealth has not shown that information obtained from these two individuals "is sufficiently attenuated from the underlying illegality so as to be purged from its taint." Commonwealth v. Damiano, 444 Mass. 444,454 (2005).[17]
            Statements of Allen
            Allen seeks to suppress all statements made to officers during his detention at the corner of Essex and Tilton, including his response that he "hit [his] head running" to Morely's inquiry about the cut near his eyebrow Allen also moves to suppress all statements he made following his formal arrest, except for his answers to standard booking questions memorialized in the booking report. Ex. 12 (booking report). There appears to be no dispute that, following his arrest, Allen was neither advised of his Miranda rights nor given an opportunity to consult with an interested adult prior to his mother's arrival at the Lynn police station.
            To resolve Allen's motion, the court must determine whether Allen, a juvenile over fourteen years of age, was in custody for purposes of Miranda. It is well settled that Miranda
 
--------------------------------------------
 
[17] Allen further requests suppression of any evidence police obtained from individuals associated with the Snapchat accounts "KSO" and "Fee RZ"; however, Strong did not believe he identified anyone associated with these accounts.
 
                                                            -27-
 
warnings are only necessary for "custodial interrogation." Oregon v. Mathiason, 429 U.S. 492, 494-495 (1977). The requirements set forth in Miranda v. Arizona, 384 U.S. 436, 444 (1966), "are not triggered unless the interrogation is custodial, and a defendant's failure to receive or understand Miranda warnings, or police failure to honor Miranda rights, does not result in suppression of a voluntary statement made in a noncustodial setting.'" Commonwealth v. Libby, 472 Mass. 37, 40 (2015) (citation omitted). "Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. at 41 (citations and internal quotations omitted).
            "The defendant bears the burden to establish the custodial nature of his or her encounter with police." Commonwealth v. Medina, 485 Mass. 296, 300 (2020) (citation omitted). The court relies on the following factors to determine whether an individual is in custody and thus requires recitation of Miranda warnings: "(1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest." Commonwealth v. Sanchez, 476 Mass. 725, 735-736 n.9 (2017), quoting from Commonwealth v. Groome, 435 Mass. 201, 211- 212 (2001).[18] However, these so-called Groome factors are nonexclusive, see Commonwealth v. Miranda, 484 Mass. 799, 835 n.49 (2020), and "rarely" does any one factor determine custody.
 
--------------------------------------------
 
[18] In Commonwealth v. Matta, the Supreme Judicial Court modified the Groome's fourth factor, stating that the appropriate inquiry "must be whether, in the circumstances, a reasonable person would believe that an officer would compel him or her to stay." 483 Mass. at 363. In making this modification, the Court noted that " in most situat ions, a reasonable person would not believe that he or she was free to leave during a police encounter." Id.
 
                                                            -28-
 
Commonwealth v. Sneed, 440 Mass. 216,220 (2003), citing Commonwealth v. Bryant, 390 Mass. 729, 737 (1984).
            The Commonwealth correctly posits that Miranda warnings generally are not required during routine field inquiries. See Commonwealth v. Cawthron, 479 Mass. 612, 616 (2018), citing Commonwealth v. Borodine, 371 Mass. 1, 4 (1976) (generally no Miranda warnings needed during Terry stop where officer has reasonable suspicion that crime has been, is being, or is about to be committed). The present case, however, does not involve a routine field investigation or a traffic stop, both of which generally do not rise to the level of custodial interrogation. Commonwealth v. Earl, 102 Mass. App. Ct. 664, 672-673 (2023). "Miranda warnings are necessary, even during a Terry investigative stop, if the suspect has been taken into custody, or if the questioning otherwise takes place in a police dominated or compelling atmosphere." Commonwealth v. Gordon, 47 Mass. App. Ct. 825, 827 (1999), quoting United States v. Bautista, 684 F.2d 1286, 1291 (9th Cir. 1982), cert. denied, 459 U.S. 1211 (1983). And, where the suspect is a juvenile, their age may be relevant to the Miranda custody analysis. "In some circumstances, a child's age ' would have affected how a reasonable person' in the suspect's position 'would perceive his or her freedom to leave' ... [such that] a reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go." Commonwealth v. Bermudez, 83 Mass. App. Ct. 46, 52 (2012), quoting JD.B. v. North Carolina, 564 U.S. 261, 272 (2011). See Commonwealth v. Ira I., 439 Mass. 805, 814 (2003) (in determining whether juvenile was subjected to custodial interrogation, court considers "how a reasonable person in the juvenile's position would have understood his situation").
 
                                                            -29-
 
            Here, recognizing that Allen was fifteen years old at the time, the court concludes that Allen was in custody for Miranda purposes when he was initially detained by police at the corner of Essex and Tilton, despite not being formally under arrest at that time. His movement was blocked in front by Morley and in back by Bernard while additional uniformed officers arrived on scene. Morley thought Allen contemplated fleeing and instructed him not to run. Officers immediately informed the youths that they were being stopped because they matched the descriptions of individuals involved in a stabbing. Police pat frisked the three youths for weapons.[19]
            Although the place of interrogation was public, six or more officers stationed themselves around the youths, who remained seated on an elevated portion of a lawn after being pat frisked. Marked police cruisers and bicycles were situated at the corner of Essex and Tilton while police directed foot traffic away from the group. A person of Allen's age could reasonably consider this type of police-dominated environment to be intimidating and coercive. Cawthron, 479 Mass. at 617 ("An interview is custodial where 'a reasonable person in the suspect's shoes would experience the environment in which the interrogation took place as coercive." '). This observation is particularly compelling where, as here, Allen had no prior experience with the criminal justice system. Compare Commonwealth v. Guyton, 405 Mass. 497, 503 (1989) (even "[e]xtensive contact with the police and other authorities by itself does not demonstrate unusual sophistication or knowledge about Miranda rights"). It is also reflected by the fact that Allen apparently urinated on himself during the stop.
 
--------------------------------------------
 
[19] The frisking of Allen and his companions for weapons was lawful where police reasonably suspected Allen and his companions to be anned and dangerous following the violent confrontation and stabbing at Alpha Convenience. Commonwealth v. Torres-Pagan, 484 Mass. 34, 36-37 (2020).
 
                                                            -30-
 
            Although the police questioning was limited and not aggressive, Morley informed Allen that he and his companions were being detained until officers could confirm or dispel, through an examination of surveillance videos, whether the youths were involved in the stabbing. See Commonwealth v. A Juvenile, 402 Mass. 275, 277-278 (l 988) ("The fact of detention might itself establish that the juvenile was in custody for Miranda purposes"). Considering the totality of these circumstances here, a reasonable person in Allen's position and of his age would have understood that he was not free to leave at the time he responded to officers' inquiries.
            Once custodial detention is established in a case involving a juvenile defendant, " the full panoply of Miranda warnings applies." Commonwealth v. A Juvenile (No. 1), 389 Mass. 128, 133 n.2 (1983). See also In re Gault, 387 U.S. 1, 55 (1967). Ordinarily, "juveniles between the ages of fourteen and eighteen must be ' afforded the opportunity to consult with an interested adult' before making a voluntary waiver of their Miranda rights." Commonwealth v. Fernandes, 487 Mass. 770, 786 (2021). A juvenile in this age category need not actually avail themselves of the opportunity to consult with an interested adult. Rather, the critical question is whether police afforded the juvenile a realistic opportunity to consult with that person. Commonwealth v. Pacheco, 87 Mass. App. Ct. 286,290 & n.6 (2015). "For a waiver to be valid without such a consultation the circumstances should demonstrate a high degree of intelligence, experience, knowledge, or sophistication on the part of the juvenile." A Juvenile (No. 1), 389 Mass. at 134.
            Here, Allen was given neither Miranda warnings nor an opportunity to consult with an interested adult before he responded to, albeit limited, on-scene questioning. Therefore, no "waiver" of Miranda could occur. Moreover, Pedone, who had arrived at Essex and Tilton, recalled at least one of the youths asking to call his mother, but the request was denied. [20] Lastly,
 
--------------------------------------------
 
[20] It does appear from BWC footage, however, that a mother of one of the youths nevertheless arrived at the comer of Essex and Tilton prior to Allen's arrest. Additionally, it is important to recognize that the situation here -
 
                                                            -31-
 
there is no evidence before the court that Allen was particularly experienced, knowledgeable, or sophisticated, especially with respect to the workings of the criminal justice system or in his interactions with police.
            Officers nevertheless could permissibly ask Allen and his companions for basic identifying information after conducting a lawful Terry stop. See Gordon, 47 Mass. App. Ct. at 828 (indicating that police may ask defendant, who is placed in custody during Terry stop, preliminary questions to determine identity without implicating Miranda). See also Commonwealth v. Rise, 50 Mass. App. Ct. 836 (2001) (asking routine booking questions of minor defendant did not violate art. 12 of Massachusetts Declaration of Rights). On the other hand, the officers' questions as to Allen's physical appearance and condition, including how he had received the cut near his eyebrow and why he and his companions were sweating, crossed the line into custodial interrogation. The answers to these questions were reasonably likely to elicit incriminating responses and, therefore, are subject to suppression.
            Even if the court concluded that Allen was not in custody for Miranda purposes in the circumstances outlined above, his statements to police at the street corner would still be subject to suppression because the Commonwealth has failed to prove beyond a reasonable doubt the voluntariness of those statements. Commonwealth v. Jackson, 432 Mass. 82, 85 (2000) (Commonwealth bears burden of proving beyond reasonable doubt that defendant's statements were made voluntarily, i.e., that they were "the product of a rational intellect and a free will"). Voluntariness turns on the "totality of the circumstances," including promises or other
 
--------------------------------------------
 
stopping three youths on the street who are suspected of being involved in a recent stabbing - is quite distinguishable from interviewing a juvenile in the controlled environment of a police station, where arrangements can be made to afford the juvenile a realistic opportunity to consult with a parent, lawyer, or other interested adult. That distinction, however, does not change this court's conclusion that Allen was in custody for purposes of Miranda after being stopped on the street, given the specific circumstances of this case.
 
                                                            -32-
 
inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings. Commonwealth v. Mandile, 397 Mass. 410,413 (1986) (citations omitted). In light of Allen's age, his inexperience with the criminal justice system, the positioning of the officers during the stop, and the absence of Miranda warnings and a genuine opportunity to consult with an interested adult, the Commonwealth has failed to prove voluntariness beyond a reasonable doubt. See Commonwealth v. Leon L., 52 Mass. App. Ct. 823,829 (2001) (juvenile defendants' statements not voluntary where juveniles had been in the United States for only short time, were frightened and upset, and detective spoke loudly and pressured juveniles to make statements).
            Lastly, the court addresses Allen's challenge to statements he made while at the Lynn police department following his arrest. It is well settled that police may ask an arrestee in their custody routine booking questions, "but not about the crime that is under investigation."' Commonwealth v. Robertson, 103 Mass. App. Ct. 772, 775 (2024), quoting Commonwealth v. Chadwick, 40 Mass. App. Ct. 425,427 (1996). In Commonwealth v. Woods, the Supreme Judicial Court determined "routine booking questions" were exempt from Miranda protections. 419 Mass. 366, 372-374 (1995), citing Pennsylvania v. Muniz, 496 U.S. 582,601 (1990) (holding routine booking questions may be asked without Miranda warnings because such questions are not usually designed to elicit incriminatory statements).
            Here, Allen's motion seeks suppression of his statements to police with the exception of his responses to standard booking questions contained in the booking report. Allen's answers to
 
                                                            -33-
 
the booking questions, therefore, are not subject to suppression. See Rise, 50 Mass. App. Ct at 842 (police may ask to ask asking routine booking questions of minor defendant),
            During the booking process, however, Allen also engaged in casual conversation with officers. The Commonwealth argues that the statements Allen voluntarily made are not subject to suppression. Ordinarily, statements volunteered by an arrestee and not made in response to custodial interrogation by police, or its functional equivalent , are not subject to suppression. It is well settled that, "[s]tatements that are volunteered by the defendant are not the subject of custodial interrogation." Vellucci, 98 Mass. App. Ct. at 279 (citation omitted). "The procedural safeguards of Miranda are required not where a suspect is merely in police custody, but rather where a suspect is subjected to custodial interrogation....Interrogation  'must reflect a measure of compulsion above and beyond that inherent in custody itself,' ... when 'a person in custody is subjected to either express questioning or its functional equivalent."' Commonwealth v. Torres, 424 Mass. 792, 796-797 (1997) (citations omitted). "The term 'functional equivalent' includes 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."' Id.
            In the present case, Allen was not advised of his Miranda rights until his mother arrived at the police station, after the booking procedure was complete. Allen, therefore, was not informed of his "right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda, 384 U.S. at 444. Consequently, the court is left to speculate whether a reasonable person of Allen's age and in his position might have volunteered statements to police during the booking process had he received these warnings and been afforded an opportunity to consult
 
                                                            34
 
with a parent or other interested adult. What is certain, however, is that his mother declined to give police permission to interview her son after her arrival at the station. In the circumstances of this case, Allen's statements at the Lynn police station, other than his answers to routine booking questions, must be suppressed.[21]
ORDER
            For the reasons set forth above, it is HEREBY ORDERED that:
1.         Allen's Motion to Suppress Statements (Paper No. 59) is ALLOWED IN PART and DENIED IN PART as follows. The motion is DENIED as to Allen's answers to standard booking questions and to questions put to him by police at the comer of Essex and Tilton regarding identification information, i.e., Allen's name, date of birth, and place of residence, and ALLOWED as to all other statements;
2.         Allen' s Motion to Suppress Evidence Resulting from Warrantless Search and Seizure (Paper No. 60) is DENIED; and
3.         Allen's Motion to Suppress Evidence Resulting from Warrantless Seizure and Searches of Cell Phone (Paper No. 64) is ALLOWED IN PART and DENIED IN PART as follows. The motion is ALLOWED as to the contents and data of the cellphone seized by police during the warrantless search and the evidence derived therefrom, and DENIED as to the fingerprints and DNA obtained during the search of the surface of the
Date: 
/s/William F. Bloomer 
Justice of the Superior Court
August 28, 2025
 
--------------------------------------------
 
[21] Although Allen's statements must be suppressed, Allen has failed to persuade the court that any physical or other evidence requires suppression under the fruit of the poisonous tree doctrine.